UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

George May,                    )
                               )
            Plaintiff,         )        CASE NO: **99-9095**
                               )
vs.                            )        **CIV-RYSKAMP**
                               )
Donald Trump, and The          )        MAGISTRATE JUDGE
Trump Organization, Inc.       )        VITUNAC
jointly and severally,         )
                               )
            Defendant's        )
                               )
_____)

COMPLAINT


    1. COMES NOW, the plaintiff, George May, and files

this his complaint and alleges;


                    FACTS


    2. The following facts are common to all counts and

causes of action hereinafter plead.

                    -1-



## JURISDICTION

3. The plaintiff, George May, is a citizen of the State of Florida, and the United States of America.

4. The plaintiff, George May, resides and is domiciled in the County of Palm Beach, State of Florida.

5. The Trump Organization, Inc., is a New York Corporation, incorporated in New York, with its principal place of business, in New York.

6. Donald Trump, is a citizen of the State of Florida, residing in West Palm Beach, Florida, in the United States of America.

7. The defendant's Donald Trump, and The Trump Organization, Inc., do business in Interstate, and International Commerce.

8. The acts complained of in the plaintiff's complaint, have occured, and are occuring in the State of Florida.

9. This is an action for damages in excess of $75,000.00.

10. This Honorable Court has jurisdiction over this matter under 15 U.S.C.A. §§ 1-7, 15 U.S.C.A. §§ 12-27, (Restraint of Trade), the, diversity of the parties, and the amount in controversy pursuant to Title 28, of The United States Code.

12. This Honorable Court has jurisdiction over this matter under 18 U.S.C.A. § et. seq.

13. This Honorable Court has jurisdiction over this matter under 15 U.S.C.A. § et. seq., The Civil Rights Act of 1870, 42 U.S.C. §1983, The Civil Rights Act of 1871, 42 U.S.C.§1985, 28 U.S.C.S. §1343(a), (1),(2),(3),(4), The Fifth, Seventh, Ninth, Thirteenth, and Four-teenth Amendments, and Article VI, Clause 2, of the United States Constitution of America, and the restatement of TORTS.

## STATEMENT OF THE CASE

14. The plaintiff, George May, realleges, and reaffirms the claims and allegations contained in paragraphs 1 through 14, and incorporates them herein.

15. The defendant's herein on or about August 17, 1998, damaged the plaintiff, George May, by conspiring to block development of gambling casino's in Florida, and "attempted to restrain the freedom of trade", by making unlawful payments to Jeb Bush, and by price discrimination, tying, and exclusive dealing contracts, mergers, and interlocking directorates, wherethe effect is to substantially to lessen competition and tend to create a monopoly in the Casino Gambling business in Florida by creating exclusive rights with the defendant's herein and the Miccosukee Corporation, A/K/A the Miccosukee Tribe, and the Seminole Corporation A/K/A the Seminole Tribe, American Citizen Indians.  See plaintiff's Addendum.

16. The defendant's herein on or about August 17, 1998, damaged the plaintiff, George May', by unreasonable interference, by contract, or combination or conspiracy, with the ordinary usual and freely-competitive pricing, and distribution system of the open market in interstate trade, by making unlawful payments to Jeb Bush, and by by creating exclusive rights with the defendant's herein, and the State of Florida, Jeb Bush, and the Miccosukee Corporation, A/K/A, the Miccosukee Tribe, and the Seminole Corporation A/k/A the Seminole Tribe, American Citizen Indians, American Citizens under the Fourteenth Amendment of the United States of America Constitution.

-3-

17. The defendant's herein conspired by their unlawful acts before mentioned herein to deprive the plaintiff, George May of his protected Civil Rights protected under the Civil Rights Act of 1870, 42 U.S.C. § 1983, The Civil Rights Act of 1871, 42 U.S.C. § 1985, 28 U.S.C.S. §1343(a),(1),(2),(3),(4),, his due process rights, and his protected rights protected under the Fifth, Seventh, Ninth, Thirteenth, and Fourteenth Amendment of the United States of America Constitution, and protected under the Supremacy Clause ARTICLE VI, Clause 2, of the United States of America Constitution, by their acts under the color of law, causing damages to the plaintiff, George May. See plaintiff's addendum attached herein.

18. The unlawful acts of the defendant's before mentioned herein, under the color of law, caused damages of in excess of $650 million dollars to the plaintiff, George May, herein as, plaintiff's prospective partners refused to participate in his Airport, Gambling Casino projects, being afraid that Attorney General Robert Butterworth would under the color of law, and the color of office send SWAT teams, to robb their slot machines, as they previously did to Gus Boulis, owner of Sun Cruz Casino's.

### COUNT I
### DAMAGES

19. The plaintiff, George May, re-alleges and re-affirms his allegations contained in his complaint 1, through 19, and incorporates them herein.

20. The defendant's have damaged the plaintiff, and continue to damage the plaintiff, George May by their unlawful acts under the color of law against the plaintiff George May, and their unlawful acts to restrain the freedom of trade, before mentioned herein.

-4-

21. The defendant's herein have caused damages to the plaintiff, George May, of in excess of $650 million dollars by their so unconstitutional taking of his liberty, property, protected rights, and freedom by their acts under the color of law, and by their restraining the freedom of trade, under the color of law.


## COUNT II
## PUNITIVE DAMAGES

22. The plaintiff, George May, re-alleges and re-affirms his allegations contained in his complaint in paragraphs 1, through 22., and incorporates them herein.

23. The defendant's acts before mentioned herein have been with knowledge, malice, intent, forethought, willingness, specific pre-mediation, wickedness, and evil purpose.

24. The defendant's have specifically directed their employees, agents, and representatives, with knowledge, forethought, intent, willingness, malice, specific premeditation, wickedness, and evil purpose, and have actively partaked in, ratified, and adopted all of the unlawful acts before mentioned herein against the plaintiff, making each defendant herein liable equally with the parties performing the acts before mentioned herein, with all the defendant's herein are liable for the resulting injury to the plaintiff, and the damages to the plaintiff, before mentioned herein.

-5-

25. The plaintiff, George May, herein, pursuant to Federal Rule of Civil Procedure 38(b), the Constitution of the United States of America, The Civil Rights Act of 1870, 42 U.S.C. § 1983, The Civil rights Act of 1871, 42 U.S.C. § 1985, under Section, 1983, actions, a trial by jury, and invokes his rights to a trial by jury under 42 U.S.C. § 1983, and demands a trial by jury in this cause herein.

26. WHEREFORE, the plaintiff, George May, demands judgement against the defendant's herein for damages caused to the plaintiff, George May, in the amount of $650 million dollars, compensory damages, and in the amount of $1 billion dollars in consequential damages, continuing damages, exemplary damages, criminal damages, and general damages, jointly and severally.

Respectfully submitted

George May
P.O. box 32247
Palm Bch. gardens
Fl. 33420
561-333-7334

-6-

PLAINTIFF'S ADDENDUM

ATTACHED HEREIN

FEDERAL RULE OF CIVIL

PROCEDURE 10(c),

EXHIBIT A.

-13-

# New suit filed in Big Black casino case

Associated Press

MAGNOLIA, Miss. — A second lawsuit accusing three Vicksburg casinos and a Mississippi bank of conspiring to block development along the Big Black River has been filed in Pike County.

The suit, filed by attorney Wayne Dowdy on behalf of two Hinds County residents, mirrors one that resulted in a $3 million judgment against the same defendants.

Dowdy filed the new lawsuit Nov. 22 against Ameristar Casinos Inc., Harrahs Vicksburg Corp., Isle of Capri Casinos and Deposit Guaranty National Bank.

Dowdy represents Walter H. Gibbes Jr. and Margaret S. Dozier, both of whom owned interest in property on which the Big Black casino would have been built.

The Mississippi Gaming Commission rejected Horsehoe Gaming's Big Black application in 1996. A Hinds County Circuit Court judge overturned the commission's ruling and the case is now before the state Supreme Court.

According to the suit, the defendants "attempted to restrain the freedom of trade," the same charge made in the previous case. Gibbes claims $3.3 million in actual damages, Dozier $1.26 million.

Earlier, Dowdy and Clinton attorney Bill Spell represented Warren County landowner E.L. Pennebaker and casino developer Jim Belisle. They said the Vicksburg casinos and the bank conspired to persuade state gaming commissioners to deny an application for a casino on Big Black between Jackson and Vicksburg.

A jury found for the plaintiffs after a two-week trial in October. The defendants have appealed.

In the Pennebaker case, the defendants said they exercised their constitutional right to free speech in opposing the Big Black site, which they said was unsuitable for a variety of reasons including environmental and historical.

**1,000 sh @ $5, Pay Comm. $8³⁰**
**100,000 sh @ $5, Pay Comm. $8⁵⁰**
**#EVERY OTC STOCK TRADE $8⁹⁰**

The Lakes/W. Sahara        254-6610

## PUBLIC NOTICE

**Redemption of Silver City Casino Gaming Chips and Tokens**

Pursuant to Regulation 12.070.2 (c) of the Nevada State Gaming Control Board, effective November 1, 1999, all denominations of gaming chips and tokens used at the Silver City Casino in Las Vegas, Nevada, have been discontinued. The discontinued chips and tokens may be redeemed 24 hours a day through February 29, 2000 at the casino cage at:

*Conspiring to Block development of Gambling Casino's*

*Attempt to Restrain The Freedom of Trade*

In the law of commercial sales, the buyer's rights to restitution are governed by U.C.C. § 2–718.

See also **Unjust enrichment, doctrine of.**

*Criminal law.* Many states have restitution programs under which the criminal offender is required to repay, as a condition of his sentence, the victim or society in money or services.

*Maritime law.* The placing back or restoring articles which have been lost by jettison: This is done, when remainder of the cargo has been saved, at the general charge of the owners of the cargo.

*Restitution of conjugal rights.* In English ecclesiastical law, a species of matrimonial cause or suit which was brought whenever either a husband or wife was guilty of the injury of subtraction, or lived separate from the other without any sufficient reason; in which case the ecclesiastical jurisdiction compelled them to come together again, if either be weak enough to desire it, contrary to the inclination of the other. 3 Bl.Comm. 94.

*Writ of restitution.* See that title.

**Restitutione extracti ab ecclesia** /rèstat(y)ùwshiyówniy ekstrǽktay ǽb əklíyz(i)yə/. In ecclesiastical law, a writ to restore a man to the church, which he had recovered for his sanctuary, being suspected of felony.

**Restitutione temporalium** /rèstat(y)ùwshiyówniy tèmpəréyl(i)yəm/. In ecclesiastical law, a writ addressed to the sheriff, to restore the temporalities of a bishopric to the bishop elected and confirmed.

**Restrain.** To limit, confine, abridge, narrow down, restrict, obstruct, impede, hinder, stay, destroy. To prohibit from action; to put compulsion upon; to restrict; to hold or press back. To keep in check; to hold back from acting, proceeding, or advancing, either by physical or moral force, or by interposing obstacle; to repress or suppress; to curb. N. L. R. B. v. Exchange Parts Co., C.A.5, 304 F.2d 368, 374.

To enjoin. See **Injunction; Restraining order.**

**Restraining order.** An order in the nature of an injunction. An order which may issue upon filing of an application for an injunction forbidding the defendant to do the threatened act until a hearing on the application can be had, and is distinguishable from an injunction, in that the former is intended only as a restraint until the propriety of granting an injunction can be determined and it does no more than restrain the proceeding until such determination. Laundry, Dry Cleaning, Dye House Workers Union, Local 3008, AFL–CIO v. Laundry Workers Intern. Union, 4 Wis.2d 542, 91 N.W.2d 320, 326. See also **Injunction; Order; Temporary restraining order.**

**Restraining powers.** Restrictions or limitations imposed upon the exercise of a power by the donor thereof.

**Restraint.** Confinement, abridgment, or limitation. Prohibition of action; holding or pressing back from action. Hindrance, confinement, or restriction of liberty. Obstruction, hindrance or destruction of trade or commerce. See **Restraint of trade; Stop.**

*Unlawful restraint.* Unlawful restraint is knowingly and without legal authority restraining another so as to interfere substantially with his liberty.

Person is guilty of "unlawful restraint" if he knowingly: (1) restrains another unlawfully in circumstances exposing him to risk of serious bodily injury; or (2) holds another in a condition of involuntary servitude. 18 Pa.C.S.A. § 2902. See also **Imprisonment.** *(False imprisonment); Kidnapping.*

**Restraint of marriage.** The law will not enforce a general restraint of marriage which bars the donee or legatee from ever marrying as a condition of receiving the gift or legacy; but limitations on a gift which conditions it on the donee's or legatee's marrying within a certain religion or nationality have been upheld.

**Restraint of princes and rulers.** In marine and war risk policies, refers to operation of sovereign power by exercise of vis major, in its sovereign capacity, controlling and divesting for the time, the authority of owner over ship, and clause applies only to acts done in exercise of sovereign power. Baker Castor Oil Co. v. Ins. Co. of North America, 157 F.2d 13. Where the "restraint of princes" clause or similar language is found in the contract, a reasonable apprehension of capture or destruction of the ship or cargo will justify nonperformance of the agreement to carry. The George J. Goulandris, D.C.Me., 36 F.Supp. 827, 830, 834. A "restraint of princes" may be an act performed for purposes connected with the prosecution of war, or some other act, such as quarantines or prohibition of entry into port for sanitary reasons.

**Restraint of trade.** Contracts or combinations which tend or are designed to eliminate or stifle competition, effect a monopoly, artificially maintain prices, or otherwise hamper or obstruct the course of trade and commerce as it would be carried on if left to the control of natural economic forces. U. S. v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 429, 64 L.Ed. 760; U. S. v. Patten, 226 U.S. 525, 33 S.Ct. 141, 144, 145, 57 L.Ed. 333. Term as used in Sherman Act means "unreasonable restraints of trade" which are illegal per se restraints interfering with free competition in business and commercial transactions which tend to restrict production, affect prices, or otherwise control market to detriment of purchasers or consumers of goods and services, or those restraints of trade, ordinarily reasonable, but made unreasonable because accompanied with specific intent to accomplish equivalent of a forbidden restraint. Klor's Inc. v. Broadway-Hale Stores, Inc., C.A.Cal., 255 F.2d 214, 230. To restrain interstate trade and commerce means to interfere unreasonably with the ordinary, usual and freely-competitive pricing or distribution system of the open market in interstate trade and commerce. A conspiracy may restrain interstate commerce even though some or all of the defendants are not engaged in interstate commerce, and even though some or all of the means employed may be acts wholly within a state, if there is a substantial and direct effect on interstate commerce. Sherman Antitrust Act, § 1. See also **Rule** *(Rule of reason);* **Sherman Antitrust Act.**

**Restraint on alienation.** A provision in an instrument of conveyance which prohibits the grantee from sell-

one which empowers the creditor to take prompt and summary action upon default in payment or breach of other conditions.

**Shave.** Sometimes used to denote the act of obtaining the property of another by oppression and extortion. Also used in an innocent sense to denote the buying of existing notes and other securities for money, at a discount. Hence to charge a man with using money for shaving is not libelous *per se.*

**Shelley's Case, Rule in.** "When the ancestor, by any gift or conveyance, taketh an estate of freehold, and in the same gift or conveyance an estate is limited, either mediately or immediately, to his heirs in fee or in tail, 'the heirs' are words of limitation of the estate, and not words of purchase." 1 Co.Rep. 93b (1581). This rule has also been expressed as follows: "Where a person takes an estate of freehold, legally, or equitably, under a deed, will, or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of any interest of the same legal or equitable quality to his heirs, or heirs of his body, as a class of persons to take in succession from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate." In re Thorne's Estate, 344 Pa. 503, 25 A.2d 811, 819.

Intimately connected with the quantity of estate which a tenant may hold in realty is the antique feudal doctrine generally known as the "Rule in Shelley's Case," which is reported by Lord Coke in 1 Coke, 93b (23 Eliz. in C.B.). This rule was not first laid down or established in that case, but was then simply admitted in argument as a well-founded and settled rule of law, and has always since been quoted as the "Rule in Shelley's Case." The rule was adopted as a part of the common law of this country, though it has long since been abolished by most states.

**Shelter.** In statutes relating to the provision of food, clothing, and shelter for one's children, term generally refers to a home with proper environments, as well as protection from the weather.

**Sheriff.** The chief executive and administrative officer of a county, being chosen by popular election. His principal duties are in aid of the criminal courts and civil courts of record; such as serving process, summoning juries, executing judgments, holding judicial sales and the like. He is also the chief conservator of the peace within his territorial jurisdiction. When used in statutes, the term may include a deputy sheriff. He is in general charge of the county jail in most states. See also **Constable; Marshall.**

*Deputy sheriff.* See **Deputy.**

**Sheriff's deed.** A document giving ownership rights in property to a buyer at a sheriff's sale (*i.e.* a sale held by a sheriff to pay a court judgment against the owner of the property). Deed given at sheriff's sale in foreclosure of a mortgage. The giving of said deed begins a statutory redemption period.

**Sheriff's sale.** A sale, commonly by auction, conducted by a sheriff or other court officer to carry out a decree of execution or foreclosure issued by a court. Examples include sales pursuant to attachments, liens and mortgages. See also **Judicial sale.**

**Sherman Antitrust Act.** Such Act (15 U.S.C.A. §§ 1–7) prohibits any unreasonable interference, by contract, or combination, or conspiracy, with the ordinary, usual and freely-competitive pricing or distribution system of the open market in interstate trade. See also Clayton Acts; Restraint of trade; Robinson-Patman Act; Rule *(Rule of reason).*

**Shield laws.** State statutes which afford privilege to journalists to not disclose information (*i.e.* notes and other materials) obtained during course of their newsgathering.

**Shifting.** Changing; varying; passing from one person to another by substitution.

**Shifting clause.** In a settlement at common law, a clause by which some other mode of devolution is substituted for that primarily prescribed. Examples of shifting clauses are: The ordinary name and arms clause, and the clause of less frequent occurrence by which a settled estate is destined as the foundation of a second family, in the event of the elder branch becoming otherwise enriched. These shifting clauses take effect under the statute of uses.

**Shifting income.** Device used by taxpayers in high tax brackets to move income from themselves to their children and others who are in a lower bracket. Short term or Clifford trusts, as well as gifts to minors, are among the devices used to accomplish this purpose.

**Shifting risk.** In insurance, a risk created by a contract of insurance on a stock of merchandise, or other similar property, which is kept for sale, or is subject to change in items by purchase and sale; the policy being conditioned to cover the goods in the stock at any and all times and not to be affected by changes in its composition.

**Shifting severalty.** See **Severalty.**

**Shifting stock of merchandise.** A stock of merchandise subject to change from time to time, in the course of trade by purchases, sales, or other transactions.

**Shifting the burden of proof.** Transferring it from one party to the other, or from one side of the case to the other, when he upon whom it rested originally has made out a *prima facie* case or defense by evidence, of such a character that it then becomes incumbent upon the other to rebut it by contradictory or defensive evidence.

**Shifting use.** See **Use.**

**Shilling.** Slang term for the act of posing as an innocent bystander at a confidence game but giving aid and assistance to the perpetrators of the scheme as a decoy.

**Shinney** /shíniy/. A local name for a homemade whisky. Moonshine.

**Shin-plaster.** Formerly, a jocose term for a bank-note greatly depreciated in value; also for paper money of a denomination less than a dollar.

**Ship,** *v.* To put on board a ship; to send by ship. Harrison v. Fortlage, 161 U.S. 57, 16 S.Ct. 488, 490, 40 L.Ed. 616. To place (goods) on board a vessel for

**Clausula vel dispositio inutilis per præsumptionem remotam, vel causam ex post facto non fulcitur** /klózhəla vàl dispəzish(iy)ow inyùwdələs pər prəzəm(p)shiyównəm, rəmówdəm, vèl kózəm éks pòwst fǽktow nòn fálsədər/. A useless clause or disposition [one which expresses no more than the law by intendment would have supplied] is not supported by a *remote presumption* [or foreign intendment of some purpose, in regard whereof it might be material], or by a cause arising afterwards [which may induce an operation of *those idle words*].

**Clausum** /klózəm/. Lat. Close, closed up, sealed. Inclosed, as a parcel of land. A writ was either *clausum* (close) or *apertum* (open). Grants were said to be by *literæ patentæ* (open grant) or *literæ clausæ* (close grant); 2 Bl.Comm. 346. Occurring in the phrase *quare clausum fregit* it denotes in this sense only realty in which the plaintiff has some exclusive interest, whether for a limited or unlimited time or for special or for general purposes.

**Clausum fregit** /klózəm fríyjət/. L. Lat. (He broke the close.) In pleading and practice, technical words formerly used in certain actions of trespass, and still retained in the phrase *quare clausum fregit (q.v.)*.

**Clausum paschæ** /klózəm pǽskiyiy/. In English law, the morrow of the *utas*, or eight days of Easter; the end of Easter; the Sunday after Easter-day.

**Clausura** /klazhúrə/. In old English law, an inclosure. *Clausura heyæ*, the inclosure of a hedge.

**Clavia** /kléyviyə/. In old English law, a club or mace; tenure *per serjeantiam claviæ*, by the serjeanty of the club or mace.

**Clawa.** A close, or small inclosure.

**Clayton Act.** A Federal law enacted in 1914 as amendment to the Sherman Antitrust Act dealing with antitrust regulations and unfair trade practices. 15 U.S.C.A. §§ 12–27. The Act prohibits price discrimination, tying and exclusive dealing contracts, mergers, and interlocking directorates, where the effect may be substantially to lessen competition or tend to create a monopoly in any line of commerce.

**Clean.** Irreproachable; innocent of fraud or wrongdoing; free from defect in form or substance; free from exceptions or reservations. It is a very delicate adjective, however, and is particularly dependent upon context.

**Clean Air Acts.** Federal and state environmental statutes enacted to regulate and control air pollution.

**Clean bill.** Bill of exchange without documents attached.

**Clean bill of health.** One certifying that no contagious or infectious disease exists, or certifying as to healthy conditions generally without exception or reservation. See Bill *(Maritime law)*.

**Clean bill of lading.** One without exception or reservation as to the place or manner of stowage of the goods, and importing that the goods are to be (or

have been) safely and properly stowed under deck. One which contains nothing in the margin qualifying the words in the bill of lading itself.

**Clean hands doctrine.** Under "clean hands" doctrine, equity will not grant relief to a party, who, as actor, seeks to set judicial machinery in motion and obtain some remedy, if such party in his prior conduct has violated conscience or good faith or other equitable principle. Franklin v. Franklin, 365 Mo. 442, 283 S.W.2d 483, 486.

**Clear.** Obvious; beyond reasonable doubt; perspicuous; plain. Free from all limitation, qualification, question or shortcoming. Free from incumbrance, obstruction, burden, limitation, etc. Plain, evident, free from doubt or conjecture, unequivocal, also unincumbered. Free from deductions or drawbacks.

**Clearance.** In maritime law, the right of a ship to leave port. The act of clearing or leaving port. The certificate issued by the collector of a port evidencing the power of the ship to leave port. In contract for exhibition of motion pictures, the interval of time between conclusion of exhibition in one theater and commencement of exhibition at another theater. Waxmann v. Columbia Pictures Corporation, D.C.Pa., 40 F.Supp. 108, 111.

**Clearance card.** A letter given to an employee by his employer, at the time of his discharge or end of service, showing the cause of such discharge or voluntary quittance, the length of time of service, his capacity, and such other facts as would give to those concerned information of his former employment.

**Clearance certificate.** Issued to ship's captain showing that customs requirements have been made.

**Clear and convincing proof.** Generally, this phrase and its numerous variations mean proof beyond a reasonable, *i.e.*, a well-founded doubt. Some cases give a less rigorous, but somewhat uncertain, meaning, *viz.*, more than a preponderance but less than is required in a criminal case.

Proof which should leave no reasonable doubt in the mind of the trier of the facts concerning the truth of the matters in issue. In Interest of Jones, 34 Ill.App.3d 603, 340 N.E.2d 269, 274.

That measure or degree of proof which will produce in mind of trier of facts a firm belief or conviction as to allegations sought to be established; it is intermediate, being more than mere preponderance, but not to extent of such certainty as is required beyond reasonable doubt as in criminal cases. Fred C. Walker Agency, Inc. v. Lucas, 215 Va. 535, 211 S.E.2d 88, 92.

See also **Beyond a reasonable doubt; Burden of proof; Clear evidence or proof.**

**Clear and present danger doctrine.** Doctrine in constitutional law, first formulated in Schenck v. U. S., 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470, providing that governmental restrictions on freedoms of speech and press will be upheld if necessary to prevent grave and immediate danger to interests which government may lawfully protect.

*Speech which incites to unlawful action falls outside the protection of the First Amendment where*

Case 9:99-cv-09095-KLR   Document 1   Entered on FLSD Docket 12/29/1999   Page 12 of 64

# The Palm

# Casinos put state, Seminoles at odds

## Congress urged to clarify law

**By Jenny Staletovich**
*Palm Beach Post Staff Writer*

More than 200 years ago, the framers of the Constitution cut a deal with the nation's Indians that today may clear the way for 24-hour casinos featuring booze, blackjack, lotteries, parimutuels and other games of chance year-round.

It's a deal that has brought negotiations for tribal casinos to the table and thrust the issue into courtrooms around the state.

Now, seven years after the Seminole Tribe of Florida first asked to open full-blown casinos, maneuvering over the issue is intensifying:

■ A tribal proposal is being reviewed by the state.

■ Donald Trump has teamed up with the tribe to persuade a stubbornly opposed Gov. Lawton Chiles. In May, Trump forked over a $50,000 contribution to the Republican Party for safe measure.

■ National negotiations are set for discussion next month



## Body of Kenya bombing victi

# Tribe could make $500 million a  year

## CASINOS

*From 1A*

"This is a country built on land stolen from one people by another people," he said. "As a result, we carry some baggage and part of our duty is the responsibility owed to the aboriginal people. And that wrapped up in two words is trust responsibility."

The trust responsibility stems from a Constitutional clause that put governing of Indian commerce in the hands of Congress. Over the years it has come to mean questions of law should be resolved in favor of Indians, or "sort of a tie in favor of the runner in baseball," Rogow said.

"It's kind of the ultimate Judeo-Christian guilt."

Across the nation, tribal gambling has become wildly profitable. In Connecticut, the Mashantucket Pequot tribe opened the largest casino in the western hemisphere in 1992 and collects as much as $1 million daily. The Mohegan tribe, which opened a nearby casino in 1996, attracts 20,000 gamblers a day. Last year, the Eastern Band of the Cherokee tribe unveiled an $82 million casino in North Carolina after striking a partnership with Harrah's Entertainment.

### Seminoles' business is booming

Altogether, about 125 gambling compacts between states and tribes have been drawn up, Glogau said.

So, it's no wonder that the Seminole tribe, which has made millions off high stakes bingo halls, wants to open casinos on land around the state.

When the Seminole tribe was officially recognized in 1957, it had a budget of just $12,000. For years, members had been living off handouts from the government.

## High stakes

The Seminole tribe is negotiating with the state to operate 24-hour casinos on tribal land. Currently, the state allows gaming halls with high stakes bingo, stud poker and Texas Hold 'Em. A lawsuit is pending over the tribe's slot machines.



**1** **Tampa** *Seminole Gaming Palace*
**2** **Ft. Pierce** *Reservation*
**3** **Brighton** *Seminole Bingo Casino*
**4** **Big Cypress** *Reservation*
**5** **Immokalee** *Seminole Gaming Palace and Casino*
**6** **Hollywood** *Hollywood Seminole Gambling*

SOURCE: Seminole Tribe of Florida

**KEY**
Reservation only ●
Reservation and gambling ■

STAFF GRAPHIC

## The Seminoles' proposal

A gambling compact submitted by the Seminole Tribe and proposing full casinos, video slot machines and lotteries is now being reviewed by state officials. Among the considerations are:

■ **Exclusive rights for casinos from the state**. In return, the tribe would cut the state in for 30 percent of the profits. If any others are granted rights, the payments would stop.

■ **Rules for running the casinos**. The National Indian Gaming Commission, not the state, would review and approve management contracts for operating the casinos. The state, however, would be allowed to monitor operations and would also review gaming licenses for employees. The tribe would be required to keep surveillance logs and logs of all payouts available to the state.

■ **Information or records** obtained by the state, however, would remain confidential unless the tribe agrees to disclose the findings.

■ **Any changes** in casino games or video slot machines approved in New Jersey, Nevada or Mississippi would automatically apply to Seminole gambling. However, if Florida revises gambling laws after the compact is passed, the tribe is not required to adopt the changes.

■ **Disputes between** the state and tribe would go to a mutually appointed mediator.

■ **The tribe** would reimburse the state all costs for overseeing Indian gambling.

Then, in the early 1970s, it began selling tax-free cigarettes and boosted its income to $4.5 million. Bingo raised the stakes even higher. In the early 1980s, its 2,500 members each received monthly payments of about $80. By October of last year, that jumped to $2,000 a month. For a family of five, that's $10,000 a month.

The tribe itself, which had a $100 million budget in 1996, has expanded its holdings to include investments in a Caribbean casino; a gambling ship, the Seminole Empress; a Tampa hotel; a rope factory; cattle and Fort Pierce's Micco Aircraft Co., which sells $150,000 planes.

James Billie, the flamboyant chairman of the tribe who uses a fleet of helicopters and planes to fly to the tribe's six reservations, has estimated casino profits could push the income to more than $500 million annually.

But the state, as Glogau noted, has steadfastly opposed casinos by rejecting them three times in voter referendums since 1978.

Until 1988, the tribe had little to argue with. Seven years earlier it won a landmark Supreme Court decision for bingo halls that paved the way for tribes around the country. But chances for full casinos were slim. Then, in 1987, the Supreme Court ruled on a case pitting California against the Cabazon Band of Mission Indians. Justices said a state that allows some form of gambling cannot enforce its gambling laws

 

Trump           Billie

on tribal lands without permission from Congress.

That led Congress to the momentous Indian Gaming Regulatory Act that launched the national war over tribal casinos.

Put simply, the act says if a state fails to negotiate a gambling compact with a tribe, the tribe can sue and force it into a deal.

But when the Seminoles tried to sue Florida in 1991, they were blocked.

The 11th Circuit Court of Appeals said the 11th Amendment that gives states — like Indians — sovereign immunity, prevents such action. A state cannot be sued unless Congress says it can, judges said. The tribe appealed to the Supreme Court which upheld the ruling in 1996.

The appellate court gave the tribe an out that the Supreme Court refused to address.

The court said the act required the secretary of the Interior to step in and devise rules for gambling on Indian lands if states refused to adopt a compact.

In 1994, the tribe asked Sec-

retary Bruce Babbitt to issue rules. Babbitt stalled and in 1997 the tribe sued him. The case is pending in Miami federal court.

Meanwhile, the tribe continued operating video slot machines in some of its casinos, machines that it says provide 90 percent of its income.

The state argues that these are a form of Class III gambling, the type that occurs in casinos and is illegal in the state. The state tried to shut them down in 1996 by filing a suit in Miami district court. The tribe argued the state had no jurisdiction because of the tribe's sovereign immunity status and a judge agreed.

The state is appealing the case to the 11th Circuit Court of Appeals, which is scheduled to hear oral arguments in October.

### Tribe willing to give state high percentage

At the urging of state officials, the U.S. attorney for the middle district of Florida also sued the tribe last year to stop the slot machines on its Tampa and Immokalee reservations. That case is also pending.

So where does that leave tribal gambling in Florida?

"We're still talking, so at least that's something," Jim Shore, general counsel for the tribe, said of negotiations with the state. "I can't address too many things while the talks are still ongoing."

The tribe's compact calls for

*[handwritten annotations: "TRUMP, Bob Bush, LIGHTINOV, DUDIANS, PARTNERS USING COLOR OF LAW Florida VALDOVE FOR SELF PROFIT"]*

casinos at existing gaming halls in Tampa, Hollywood, Brighton and Immokalee and proposes building more in Orlando, Jacksonville, Coconut Creek and Miami.

The tribe is willing to give the state 30 percent of the profits from casinos at existing gaming halls and, as extra incentive, a 45 percent cut from additional casinos the state approves. (The tribe wants exclusive rights to casino gambling in the state and cannot build casinos on new land without the governor's consent.)

Trump, who opposed tribal gambling as recently as 1996, has begun courting Billie, hiring him to perform at his Mar-A-Lago club in Palm Beach and inviting him to be a judge at his Miss Universe contest last year, the *St. Petersburg Times* reported in a critical series last year questioning tribal spending.

Together, the pair hired lobbyist Mallory Horne, a longtime friend of the governor, to promote their cause. Horne met with the governor's staff in June.

Trump also donated $50,000 to the Republican Party and hosted a fund-raiser at his New York condominium attended by GOP gubernatorial candidate Jeb Bush. Bush has said he opposes casino gambling in the state.

Trump, Horne and Billie did not return phone calls. And Shore won't comment on Trump's participation in negotiations.

But Glogau said Trump's role makes little difference to the state.

"It's unimportant to us that he's in the picture at all," he said.

What concerns the state more is Babbitt's stance.

"The federal government as a general proposition treats Indian tribes as beneficiaries of a trust and feels their job is to watch out for tribes," Glogau said. "So, any time we get in a situation with the federal government, they take the Indian side."

## Congress may have to step in between tribe, states

Last month, Chiles sent Babbitt a letter ardently opposing any rules that would allow gambling. But while rumors fly that Babbitt will approve rules, his spokeswoman, Stephanie Hanna, said a yearlong moratorium passed by Congress has left the agency's hands tied. Rogow has objected to that interpretation in court motions, saying the moratorium doesn't apply to the tribe's request.

"I don't know that sort of arcane legal argument that I could speculate on," Hanna said. "We absolutely can't go forward until Oct. 1."

Ultimately, the issue of tribal gambling could rest on clearing up confusion created by the Indian Gambling Regulation Act and getting Congress to again referee states and tribes.

"The tribes have become very vigilant about protecting their rights and the states have become very defensive and, of course, the stakes have gotten a lot higher because of the economics," Rogow said. "But the real problem is the statute was such a mess that in trying to please everybody, it pleased nobody and I think that's a lesson of life."

■

*Staff researcher Barbara Gellis Shapiro contributed to this story.*

# Tribe, state at standoff over casinos

**The Seminoles have been busy, though, planning gaming halls, anticipating a federal decision in its favor.**

**By Jenny Staletovich**
*Palm Beach Post Staff Writer*

The eight-year war to bring full-blown Indian casinos to Florida may have reached yet another standoff, but don't tell the Seminole tribe.

Around Indian country, business is booming.

In recent months, the tribe has unveiled plans for the Seminole Grand, a $160 million gaming hall and hotel in Hollywood; broken ground on two new gaming halls — one on the Brighton Reservation and another in Coconut Creek — that could easily be transformed into casinos; started plans to build a four-story, 100-room hotel in Immokalee; initiated buying 1,240 acres north of the Brighton Reservation; and continued negotiating with an Osceola County family to buy 4,100 acres just 15 miles from Disney World.

**Billie:** Chief of the Seminoles bought a jet from the estate of Jordan's King Hussein in August.

Last September, the tribal council forked over $250,000 for two luxury skyboxes at Pro Player Stadium and another $120,000 for a suite at the Broward arena.

Even Chief James Billie splurged in August, adding a Gulfstream IV bought from the estate of Jordan's late King Hussein to a tribal fleet that includes a jet once owned by Ferdinand Marcos.

*Please see* **INDIAN CASINOS, 6A**

How Does A 31 Million dollar Jet Help The Poor Seminoles or The Schools IN Florida

All American Citizens Have The Same Rights As

American Citizen Seminole's

14TH Amend.

Supremacy Clause

Article 6
Clause 1
Clause 2

5TH Amend.

U.S. Constitution



July 19, 1999

<u>Via First Class Mail</u>
George May
P.O. Box 32247
Palm Beach Gardens, FL  33420

Dear Mr. May:

Thanks you for your recent letter.  Individuals may contribute to Bush for President up to $1,000 ($2,000 per couple) and federally registered multi-candidate political action committees may contribute up to $5,000.  Corporate and foreign national contributions are prohibited under federal law.  Contributions to Bush for President are not tax deductible for federal income tax purposes.

If you have any legal questions regarding contributions to Bush for President, please do not hesitate to call me.  Thank you for your support.

Sincerely,

Michael E. Toner
General Counsel

# JUSTICE FOR LANDOWNERS
## *The Del Monte Dunes Victory*

*By Fred Kelly Grant*



Score one for private property owners! In *City of Monterrey v. Del Monte Dunes* (Case No. 97-1235, opinion issued May 24, 1999) the United States Supreme Court mandated that a property owner is entitled to *a jury trial in a case seeking damages pursuant to 42 U.S.C. 1983 resulting from a regulatory taking without compensation.* The decision affirmed a jury verdict awarding the land owner $1.45 million because of the city's zoning denial of the owner's request to develop private property.

To fully understand the impact of the decision, one must recognize the nature of Section 1983 actions, and the egregious nature of the underlying facts which led to the decision. Section 1983 is a federal statute which allows a party to seek damages when he has been deprived of a federal right. The "federal right" relevant to the Monterrey Dunes landowner was the fifth amendment provision that takings of land must be accompanied by just compensation.

The jury verdict had been affirmed by the 9th Circuit Court of Appeals. But, in an earlier decision, the 11th Circuit held that there was no right to jury trial on a takings claim brought under Section 1983. The Supreme Court decision put the issue to rest.

The importance of the decision must not be understated. The jury was allowed to determine both the liability of the city, (i.e., whether there was a regulatory taking of the property and whether the regulation bore a reasonable relationship to the public interest which the city said it was pursuing) and the resulting damages. It is a generally held belief that a property owner will fare better before a jury on the issue of liability than he will before a judge sitting without a jury. Critical observers of the judiciary believe that many judges have become fixtures of the "system" with at least an unexpressed commitment to preserve and protect administrative decisions made within the "system". Most often, a jury is not as concerned about the "system" working as it is about fairness to individuals in their relationship with government.

So, within those who continue to fight to protect property rights and liberty, there has been widespread praise for the Supreme Court's decision. Some have even proclaimed that the right of jury trial has been extended to condemnation actions. Not so. The decision is a landmark for property owners, but the Court takes pain to point out that it does not affect condemnation or even inverse condemnation cases. It appears quite clear that the decision applies only to 1983 damage actions where the property owner charges a regulatory taking and the government denies liability, no just compensation has been paid, and there is no forum for determining post-deprivation remedy.

The facts described by the Court show a pointed and obvious attempt by the city government to prevent development of the landowner's property which consisted of a 37.6 acre ocean-front parcel in the city of Monterrey. The property was zoned for multifamily residential use, which would have allowed up to 1,000 residential units on the parcel. In 1981 the landowner proposed to develop 344 units. In 1982 the city planning commission denied the request but stated that a proposal for 264 units would be favorably viewed. The landowner modified its proposal in accordance with the city's view, but in 1983 the planning commission again denied the request, stating that a proposal for 224 units would be favorably considered. The landowner again modified its proposal to 224 units only to have the request again denied. This time the landowner appealed to the city council which overruled the planning commission and remanded the case with instructions to proceed with a proposal for 190 units. The landowner again reduced the proposed units as instructed, but again the proposal was denied in 1984. The landowner again appealed to the city council which overruled the commission, approved the site plans with special conditions and issued an 18 month conditional use permit for the development.

Most of the following year the landowner spent in revising the proposal and taking the steps outlined in the special conditions imposed by the city. The final plan called for construction of residential units on only 5.1 of the 37.6 acres. 17.9 acres were to be devoted to public open space, 7.9 acres to open; land-scaped areas, and 6.7 acres to public and private streets. The city's architectural review committee and planning staff recommended approval, but the planning commission rejected this advice and again denied approval. On appeal, the city council also denied

the request but declined to specify measures which the landowner could take to gain approval and refused to extend the time given on the conditional use permit. The denial was not based upon any failure of the landowner to comply with the city's conditions -- all conditions had been met.

As the Court stated: "After five years, five formal decisions, and 19 different site plans...respondent Del Monte Dunes decided the city would not permit development of the property under any circumstances." So, the landowner filed suit in the U.S. District Court under 42 U.S.C. 1983, charging that "denial of the final development proposal was a violation of the Due Process and Equal Protection provisions of the Fourteenth Amendment and an uncompensated, and so unconstitutional, regulatory taking."

Initially, the District Court dismissed the claims, partially on the grounds that the landowner had not sought just compensation in a state court. The 9th Circuit reversed, pointing out that the state of California had not provided "a compensatory remedy for temporary regulatory takings" at the time the final denial was issued. So, the landowner was allowed to proceed in Federal District Court.

Then, over the city's objection, the District Court submitted the landowners claim to a jury (minus the due process claim which the court itself decided in the city's favor). The jury found for the landowner on its regulatory takings claim, and found damages in the amount of $1.45 million. The 9th Circuit affirmed, and the city secured review by writ of certiorari to the Supreme Court.

Eighteen years after the landowner first attempted to develop its property, in a

manner consistent with the city's zoning ordinance, the Supreme Court issued its decision affirming the favorable lower court decisions.

The Court ruled that Section 1983 itself does not afford the right to a jury trial. But, the 7th Amendment provides that "in Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The Court pointed out that this protection extends not only to causes of action which were recognized at common law but to statutory causes of action which are based on legal concepts which at common law were decided by courts of law rather than of equity or admiralty. A cause of action "sounding in tort" involves such concept, because tort causes were determined by common law courts of law. (A "tort" is a non-contractual wrong committed against a person or his property for which a remedy in the form of an action for monetary damages is provided.) The Court further ruled that the 7th Amendment guarantee of a jury trial applies to a statutory cause of action under Section 1983 which is based upon a "tort" concept.

The Court pointed out that the landowner was "denied not only its property but also just compensation or even an adequate forum for seeking it." Thus, the claim filed under Section 1983 was based upon a concept of tortious, or wrongful, conduct on the part of the city, and was the type of action at law to which the 7th Amendment is applicable.

The city contended that no jury submission was required because there is no right to jury trial in condemnation cases. But, the Court distinguished the case from the condemnation concept, pointing out that in a condemnation proceeding the government announces its taking of the

property, and then allows the landowner a forum for determining just compensation. The Court pointed out that in the instant case the government did not acknowledge the taking and did not provide a forum for fixing "just compensation," thus the landowner was forced to bring his own action to seek redress. The Court stated that the landowner "sought not just compensation per se but rather damages for unconstitutional denial of such compsensation," and pointed out that lawsuits seeking monetary relief are appropriate for jury determination.

It is important for the landowner to note several limitations specifically related to application of this decision: (1) the decision is not applicable to condemnation cases, (2) the decision is not applicable to "an ordinary inverse condemnation suit," and (3) a federal court cannot entertain a takings claim under Section 1983 unless the landowner has been denied a postdeprivation remedy(such as by the absence of a procedure wherein a state court can grant relief for regulatory takings).

The overriding importance of the decision, however, is that the Court specifically distinguished the Section 1983 action from "an ordinary inverse condemnation suit" and a condemnation action, stating that the 1983 action presents a scenario in which "the jury's role in vindicating consitutional rights has long been recognized by the federal courts."

*Editors' Note: The "jury" issue was decided by a 5-4 vote. The other issues involved in the case caused a shifting of the Justices, and the filing of concurring and dissenting opinions. The jury issue itself is a clear mandate. Discussion of the other issues, while interesting from a "court watching" standpoint and from the standpoint of setting the parameters of the limits placed on the "jury decision," must take place elsewhere.*

1st Session    SENATE    DOCUMENT No. 99-16

# THE CONSTITUTION

OF THE

# UNITED STATES OF AMERICA

ANALYSIS AND INTERPRETATION

ANNOTATIONS OF CASES DECIDED BY THE
SUPREME COURT OF THE UNITED STATES
TO JULY 2, 1982

*PALM BEACH COUNTY*
*PUBLIC LIBRARY SYSTEM*
*3650 SUMMIT BLVD.*
*WEST PALM BEACH, FLORIDA 33406*



PREPARED BY THE
CONGRESSIONAL RESEARCH SERVICE
LIBRARY OF CONGRESS

JOHNNY H. KILLIAN, EDITOR
LELAND E. BECK, ASSOCIATE EDITOR

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1987

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, DC 20402

# PRIOR DEBTS, NATIONAL SUPREMACY, AND OATHS OF OFFICE

## ARTICLE VI

Clause 1. All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

### PRIOR DEBTS

There are no annotations to this clause.



Clause 2. This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby; any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

### NATIONAL SUPREMACY

#### Marshall's Interpretation of the National Supremacy Clause

Although the Supreme Court had held prior to Marshall's appointment to the Bench, that the supremacy clause rendered null and void a state constitutional or statutory provision which was inconsistent with a treaty executed by the Federal Government,[1] it was left for him to develop the full significance of the clause as applied to acts of Congress. By his vigorous opinions in *McCulloch* v. *Maryland*[2] and *Gibbons* v. *Ogden*[3] he gave the principle a vitality which survived a century of vacillation under the doctrine of dual federalism. In the former case, he asserted broadly that "the States have no power, by taxation or otherwise, to retard, impede, burden,

---

[1] *Ware* v. *Hylton*, 3 Dall. (3 U.S.) 199 (1796).
[2] 4 Wheat. (17 U.S.) 316 (1819).
[3] 9 Wheat. (22 U.S.) 1 (1824).

*Tort Actions Against State Officials.*—In *Tindal* v. *Wesley*,[16] the Court adopted the rule of *United States* v. *Lee*,[17] a tort suit against federal officials, to permit a tort action against state officials to recover real property held by them and claimed by the State and to obtain damages for the period of withholding. The immunity of a State from suit has long been held not to extend to actions against state officials for damages arising out of willful and negligent disregard of state laws.[18] The reach of the rule is evident in *Scheuer* v. *Rhodes*,[19] in which the Court held that plaintiffs were not barred by the Eleventh Amendment or other immunity doctrines from suing the governor and other officials of a State alleging that they deprived plaintiffs of federal rights under color of state law and seeking damages, when it was clear that plaintiffs were seeking to impose individual and personal liability on the officials. There was no "executive immunity" from suit, the Court held; rather, the immunity of state officials is qualified and varies according to the scope of discretion and responsibilities of the particular office and the circumstances existing at the time the challenged action was taken.[20]

*[handwritten] Florida HAS clipped sovereignty subject to Treaty of 1848 + Land patent Act*

*[handwritten] FLA's Gaming Laws are void, unconstitutional, discriminate and*

[16] 167 U.S. 204 (1897).

[17] 106 U.S. 196 (1897).

[18] *Johnson* v. *Lankford*, 245 U.S. 541 (1918); *Martin* v. *Lankford*, 245 U.S. 547 (1918).

[19] 416 U.S. 232 (1974).

[20] These suits, like suits against local officials and municipal corporations, are typically brought pursuant to 42 U.S.C. §1983 and typically involve all the decisions respecting liability and immunities thereunder. On the scope of immunity of federal officials, see supra, pp. 760–763.

*[handwritten] ARE without subject and the Jones doctrine*

*[handwritten] American Citizen. Indian's on American Citizen land have Casino Gambling*

# RIGHTS GUARANTEED

## PRIVILEGES AND IMMUNITIES OF CITIZENSHIP, DUE PROCESS AND EQUAL PROTECTION

### FOURTEENTH AMENDMENT

SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.



### CITIZENS OF THE UNITED STATES

In the *Dred Scott Case*,[1] Chief Justice Taney for the Court ruled that United States citizenship was enjoyed by two classes of individuals: (1) white persons born in the United States as descendents of "persons, who were at the time of the adoption of the Constitution recognized as citizens in the several States and [who] became also citizens of this new political body," the United States of America, and (2) those who, having been "born outside the dominions of the United States," had migrated thereto and been naturalized therein. The States were competent, he continued, to confer state citizenship upon anyone in their midst, but they could not make the recipient of such status a citizen of the United States. The Negro, according to the Chief Justice, was ineligible to attain United States citizenship, either from a State or by virtue of birth in the United States, even as a free man descended from a Negro residing as a free man in one of the States at the date of ratification of the Constitution.[2] Congress, first in § 1 of the Civil Rights

---

[1] *Scott v. Sandford*, 19 How. (60 U.S.) 393, 404–406, 417–418, 419–420 (1857).

[2] The controversy, political as well as constitutional, which this case stirred and still stirs, is exemplified and analyzed in the material collected in S. Kutler, *The Dred Scott Decision: Law or Politics?* (Boston: 1967).

In the law of commercial sales, the buyer's rights to restitution are governed by U.C.C. § 2–718.

See also Unjust enrichment, doctrine of.

*Criminal law.* Many states have restitution programs under which the criminal offender is required to repay, as a condition of his sentence, the victim or society in money or services.

*Maritime law.* The placing back or restoring articles which have been lost by jettison: This is done, when remainder of the cargo has been saved, at the general charge of the owners of the cargo.

*Restitution of conjugal rights.* In English ecclesiastical law, a species of matrimonial cause or suit which was brought whenever either a husband or wife was guilty of the injury of subtraction, òr lived separate from the other without any sufficient reason; in which case the ecclesiastical jurisdiction compelled them to come together again, if either be weak enough to desire it, contrary to the inclination of the other. 3 Bl.Comm. 94.

*Writ of restitution.* See that title.

**Restitutione extracti ab ecclesia** /rèstət(y)ùwshiyówniy ekstrǽktay æb əklìyz(i)yə/. In ecclesiastical law, a wrt to restore a man to the church, which he had recovered for his sanctuary, being suspected of felony.

**Restitutione temporallum** /rèstət(y)ùwshiyówniy tèmpəréyl(i)yəm/. In ecclesiastical law, a writ addressed to the sheriff, to restore the temporalities of a bishopric to the bishop elected and confirmed.

**Restrain.** To limit, confine, abridge, narrow down, restrict, obstruct, impede, hinder, stay, destroy. To prohibit from action; to put compulsion upon; to restrict; to hold or press back. To keep in check; to hold back from acting, proceeding, or advancing, either by physical or moral force, or by interposing obstacle; to repress or suppress; to curb. N. L. R. B. v. Exchange Parts Co., C.A.5, 304 F.2d 368, 374.

To enjoin. See Injunction; Restraining order.

**Restraining order.** An order in the nature of an injunction. An order which may issue upon filing of an application for an injunction forbidding the defendant to do the threatened act until a hearing on the application can be had, and is distinguishable from an injunction, in that the former is intended only as a restraint until the propriety of granting an injunction can be determined and it does no more than restrain the proceeding until such determination. Laundry, Dry Cleaning, Dye House Workers Union, Local 3008, AFL–CIO v. Laundry Workers Intern. Union, 4 Wis.2d 542, 91 N.W.2d 320, 326. See also Injunction; Order; Temporary restraining order.

**Restraining powers.** Restrictions or limitations imposed upon the exercise of a power by the donor thereof.

**Restraint.** Confinement, abridgment, or limitation. Prohibition of action; holding or pressing back from action. Hindrance, confinement, or restriction of liberty. Obstruction, hindrance or destruction of trade or commerce. See Restraint of trade; Stop.

*Unlawful restraint.* Unlawful restraint is knowingly and without legal authority restraining another so as to interfere substantially with his liberty.

Person is guilty of "unlawful restraint" if he knowingly: (1) restrains another unlawfully in circumstances exposing him to risk of serious bodily injury; or (2) holds another in a condition of involuntary servitude. 18 Pa.C.S.A. § 2902. See also Imprisonment. (False imprisonment); Kidnapping.

**Restraint of marriage.** The law will not enforce a general restraint of marriage which bars the donee or legatee from ever marrying as a condition of receiving the gift or legacy; but limitations on a gift which conditions it on the donee's or legatee's marrying within a certain religion or nationality have been upheld.

**Restraint of princes and rulers.** In marine and war risk policies, refers to operation of sovereign power by exercise of vis major, in its sovereign capacity, controlling and divesting for the time, the authority of owner over ship, and clause applies only to acts done in exercise of sovereign power. Baker Castor Oil Co. v. Ins. Co. of North America, 157 F.2d 13. Where the "restraint of princes" clause or similar language is found in the contract, a reasonable apprehension of capture or destruction of the ship or cargo will justify nonperformance of the agreement to carry. The George J. Goulandris, D.C.Me., 36 F.Supp. 827, 830, 834. A "restraint of princes" may be an act performed for purposes connected with the prosecution of war, or some other act, such as quarantines or prohibition of entry into port for sanitary reasons.

**Restraint of trade.** Contracts or combinations which tend or are designed to eliminate or stifle competition, effect a monopoly, artificially maintain prices, or otherwise hamper or obstruct the course of trade and commerce as it would be carried on if left to the control of natural economic forces. U. S. v. Reading Co., 253 U.S. 26, 40 S.Ct. 429, 64 L.Ed. 760; U. S. v. Patten, 226 U.S. 525, 33 S.Ct. 141, 144, 145, 57 L.Ed. 333. Term as used in Sherman Act means "unreasonable restraints of trade" which are illegal per se restraints interfering with free competition in business and commercial transactions which tend to restrict production, affect prices, or otherwise control market to detriment of purchasers or consumers of goods and services, or those restraints of trade, ordinarily reasonable, but made unreasonable because accompanied with specific intent to accomplish equivalent of a forbidden restraint. Klor's Inc. v. Broadway-Hale Stores, Inc., C.A.Cal., 255 F.2d 214, 230. To restrain interstate trade and commerce means to interfere unreasonably with the ordinary, usual and freely-competitive pricing or distribution system of the open market in interstate trade and commerce. A conspiracy may restrain interstate commerce even though some or all of the defendants are not engaged in interstate commerce, and even though some or all of the means employed may be acts wholly within a state, if there is a substantial and direct effect on interstate commerce. Sherman Antitrust Act, § 1. See also Rule (Rule of reason); Sherman Antitrust Act.

**Restraint on alienation.** A provision in an instrument of conveyance which prohibits the grantee from sell-

**1095**

*o ʋ ɛ̌↗*

**Proper independent advice.** As to donor means that he had preliminary benefit of conferring upon subject of intended gift with a person who was not only competent to inform him correctly of its legal effect, but who was so disassociated from interests of donee as to be in position to advise with donor impartially and confidentially as to consequences to donor of his proposed gift.

**Proper lookout.** Duty imposed on motorist to keep such lookout requires motorist to use care, prudence, watchfulness, and attention of an ordinarily prudent person under same or similar circumstances. Such lookout as person of ordinary care and prudence would have kept under same or similar conditions. Duncan v. Durham, Tex.Civ.App., 356 S.W.2d 377, 380. See also **Lookout.**

**Proper party.** As distinguished from a necessary party, is one who has an interest in the subject-matter of the litigation, which may be conveniently settled therein. One without whom a substantial decree may be made, but not a decree which shall completely settle all the questions which may be involved in the controversy and conclude the rights of all the persons who have any interest in the subject of the litigation. See Fed.R.Civil P. 19.

A proper party is one who may be joined in action but whose nonjoinder will not result in dismissal. Jones Knitting Corp. v. A. M. Pullen & Co., D.C.N.Y., 50 F.R.D. 311, 314. Those without whom cause might proceed but whose presence will allow judgment more clearly to settle controversy among all parties. Cities Service Oil Co. v. Kronewitter, 199 Kan. 228, 428 P.2d 804, 807. See also **Parties.**

**Property.** That which is peculiar or proper to any person; that which belongs exclusively to one. In the strict legal sense, an aggregate of rights which are guaranteed and protected by the government. Fulton Light, Heat & Power Co. v. State, 65 Misc.Rep. 263, 121 N.Y.S. 536. The term is said to extend to every species of valuable right and interest. More specifically, ownership; the unrestricted and exclusive right to a thing; the right to dispose of a thing in every legal way, to possess it, to use it, and to exclude every one else from interfering with it. That dominion or indefinite right of use or disposition which one may lawfully exercise over particular things or subjects. The exclusive right of possessing, enjoying, and disposing of a thing. The highest right a man can have to anything; being used to refer to that right which one has to lands or tenements, goods or chattels, which no way depends on another man's courtesy.

The word is also commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate. It extends to every species of valuable right and interest, and includes real and personal property, easements, franchises, and incorporeal hereditaments, and includes every invasion of one's property rights by actionable wrong. Labberton v. General Cas. Co. of America, 53 Wash.2d 180, 332 P.2d 250, 252, 254.

Property embraces everything which is or may be the subject of ownership, whether a legal ownership, or whether beneficial, or a private ownership. Davis v. Davis, Tex.Civ.App., 495 S.W.2d 607, 611. Term includes not only ownership and possession but also the right of use and enjoyment for lawful purposes. Hoffmann v. Kinealy, Mo., 389 S.W.2d 745, 752.

Property, within constitutional protection, denotes group of rights inhering in citizen's relation to physical thing, as right to possess, use and dispose of it. Cereghino v. State By and Through State Highway Commission, 230 Or. 439, 370 P.2d 694, 697.

Goodwill is property, Howell v. Bowden, Tex.Civ. App., 368 S.W.2d 842, 848; as is an insurance policy and rights incident thereto, including a right to the proceeds, Harris v. Harris, 83 N.M. 441, 493 P.2d 407, 408.

*Criminal code.* "Property" means anything of value, including real estate, tangible and intangible personal property, contract rights, choses-in-action and other interests in or claims to wealth, admission or transportation tickets, captured or domestic animals, food and drink, electric or other power. Model Penal Code, § 223.0. See also *Property of another, infra.*

*Trusts.* Under definition in Restatement, Second, Trusts, § 2(c), it denotes interest in things and not the things themselves.

### Classification

Property is either: real or immovable; or, personal or movable. Calif.Civil Code, § 657.

See also Chattel; Community property; Intangible property; Interest; Land; Literary property; Lost property; Marital property.

*Absolute property.* In respect to chattels personal property is said to be "absolute" where a man has, solely and exclusively, the right and also the possession of movable chattels. In the law of wills, a bequest or devise "to be the absolute property" of the beneficiary may pass a title in fee simple. Or it may mean that the property is to be held free from any limitation or condition or free from any control or disposition on the part of others. See **Fee simple.**

*Common property.* A term sometimes applied to lands owned by a municipal corporation and held in trust for the common use of the inhabitants. Also property owned jointly by husband and wife under the community system. See **Community property,** also *"Public property", infra.*

*Community property.* See that title.

*Ganancial property.* See that title.

*General property.* The right and property in a thing enjoyed by the *general owner.* See **Owner.**

*Intangible property.* Property which cannot be touched because it has no physical existence such as claims, interests, and rights. See also **Intangible asset.**

*Literary property.* See **Literary.**

*Mislaid property.* Property which an owner has put deliberately in a certain place but owner is unable to remember where he put it, as distinguished from lost property which the owner leaves unwittingly in a place, forgetting its location.

STATE OF FLORIDA

# Office of the Governor

THE CAPITOL
TALLAHASSEE, FLORIDA 32399-0001

JEB BUSH
GOVERNOR

March 15, 1999

Mr. George May
Post Office Box 32247
Palm Beach, Florida 33420

Dear Mr. May:

Thank you for your recent letter and your request for a joint venture partner.

As you are aware, the Florida electorate has overwhelmingly rejected casino gambling in three separate ballot initiatives.

I am opposed to the expansion of gambling in Florida and believe the economic promises offered by the casino promoters are illusory, at best. I have long been concerned about the effects gambling will have on all parts of our community, especially young people and elders.

I am supportive of entrepreneurial and economic development activities, however, those activities should not occur at the expense of the public good.

Thank you again for writing and sharing your opinions with me.

Sincerely,

Jeb Bush

JB/msb

# On this date 10 years ago, a landmark resort changed how the world thought of Las Vegas

A n erupting volcano. White tigers. Sharks and dolphins. Siegfried and Roy.

With these signature hallmarks, The Mirage hotel and casino raised the bar for the gaming and hospitality industry when it opened Nov. 22, 1989.

"It changed the face of the whole city," said Anthony Curtis, publisher of Las Vegas Advisor.

The opulence and elegance characteristic of Strip megaresorts such as the MGM Grand, Bellagio and The Venetian can be largely traced to The Mirage and its dynamic founder, Steve Wynn.

"He was a real visionary and he had a good track record," said Paul Christensen, a Clark County commissioner when The Mirage was proposed and former chairman of the Las Vegas Convention and Visitors Authority.

"He's one of those type of people whose mind is always nine miles ahead of everyone else."

At a price tag of $630 million, The Mirage challenged Caesars Palace as the premier property in Las Vegas 10 years ago, and was the first new hotel to be built on the Strip in 16 years.

It became the largest hotel in the world with 3,044 rooms, standing 29 stories in a Y-shaped design that was copied by Treasure Island. Monte Carlo and Mandalay Bay. The top five floors were reserved for high-roller rooms and penthouse suites.

Room rates were $89 a night, a little pricey in this town where gamblers were always assured of cheap food and lodging once they got here.

The rooms were thoughtfully appointed with hair dryers and vanity

**Please see MIRAGE/2D**



# THEN & NOW

| 1989 | | 1999 |
|---|---|---|
| 708,750 | Clark County population | 1,337,400 |
| 18.1 million | Las Vegas visitor volume | 32.3 million |
| $11.9 billion | Visitor dollar contribution | $24.6 billion |
| $3.4 billion | Clark County gaming revenue | $6.3 billion* |
| 1.5 million | Las Vegas convention attendance | 3.3 million* |
| Frank Sinatra | Strip headliners | Huey Lewis |
| Bobby Berosini | | Danny Gans |
| Wayne Newton | | Wayne Newton |
| "Roseanne" | Top television show | "ER" |



Berosini



Gans

## GOODBYE ...

Aladdin
Continental
Dunes
El Rancho
Gold Strike
Hacienda
King 8



1995: A Landmark no more



1996: Sands turns to dust

Landmark
Marina
Maxim
Paddlewheel
Park
Sands
Vegas World

## ... HELLO

| | | |
|---|---|---|
| Bellagio | MGM Grand | Silverton |
| Boulder Station | Monte Carlo | Speedway |
| Excalibur | New York-New York | Stratosphere |
| Fiesta | The Orleans | Sunset Station |
| Four Seasons | Paris | Texas Station |
| Hard Rock | Reserve | Treasure Island |
| Luxor | Resort at Summerlin | Vacation Village |
| Main Street Station | Rio | Venetian |
| Mandalay Bay | Santa Fe | Wild Wild West |



1999: Paris' Eiffel restaurant gets its piano

*For 1998, latest year available

Mike Johnson, Review-Journal

*(handwritten at bottom)*
14th Amendment 20% TAX

MORE MONEY FOR ALL BY
TREATY OF 1819 ANTEDATED TREATY
1848 LAND PATENT ACT 1850



April 21, 1997

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 32247

Dear Mr. May:

Thank you very much for all the information you sent relative to my concerns in Palm Beach; it is very much appreciated. I believe this material will be quite helpful, and I have sent it on to my attorneys for review.

With best wishes,

Sincerely,

Donald J. Trump

Case 9:99-cv-09095-KLR   Document 1   Entered on FLSD Docket 12/29/1999   Page 29 of 64

BY AUTHORITY OF CONGRESS.

THE

# Public Statutes at Large

OF THE

# UNITED STATES OF AMERICA,

FROM THE

ORGANIZATION OF THE GOVERNMENT IN 1789, TO MARCH 3, 1845.

ARRANGED IN CHRONOLOGICAL ORDER.

WITH

REFERENCES TO THE MATTER OF EACH ACT AND TO THE SUBSEQUENT ACTS
ON THE SAME SUBJECT,

AND

COPIOUS NOTES OF THE DECISIONS

OF THE

## Courts of the United States

CONSTRUING THOSE ACTS, AND UPON THE SUBJECTS OF THE LAWS.

WITH AN

INDEX TO THE CONTENTS OF EACH VOLUME,

AND A

FULL GENERAL INDEX TO THE WHOLE WORK, IN THE CONCLUDING VOLUME.

TOGETHER WITH

The Declaration of Independence, the Articles of Confederation, and
the Constitution of the United States;

AND ALSO,

TABLES, IN THE LAST VOLUME, CONTAINING LISTS OF THE ACTS RELATING TO THE JUDICIARY,
IMPOSTS AND TONNAGE, THE PUBLIC LANDS, ETC.

EDITED BY

RICHARD PETERS, ESQ.,

COUNSELLOR AT LAW.

The rights and interest of the United States in the stereotype plates from which this work is printed, are hereby recognised,
acknowledged, and declared by the publishers, according to the provisions of the joint resolution of Congress, passed March 3, 1845.

VOL. III.

BOSTON:

LITTLE, BROWN AND COMPANY.

1854.

Case 9:99-cv-09095-KLR   Document 1   Entered on FLSD Docket 12/29/1999   Page 30 of 64

STATUTE II.
March 3, 1821.

CHAP. XXXIX.—*An Act for carrying into execution the treaty between the United States and Spain, concluded at Washington on the twenty-second day of February, one thousand eight hundred and nineteen.* (a)

President authorized to take possession of

Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, That the President of the

(a) See note to act of Mar. 3, 1819, ch. 93, for the acts passed relating to the territory of Florida.

The decisions of the Supreme Court upon the treaty between the United States and Spain of 22d of February, 1819, by which Florida was ceded to the United States, and upon the act of March 3, 1821, have been :

By the stipulations of a treaty, are to be understood its language and apparent intentions, manifested in the instrument ; with a reference to the contracting parties, the subject matter and persons on whom it is to operate. United States v. Arredondo et al., 6 Peters, 710.

The judiciary is not that department of the government to which the assertion of its interest against foreign powers is confided ; and its duty, commonly, is to decide upon individual rights according to those principles which the political departments of the nation have established. If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous. However individual judges might construe the treaty of St. Ildefonso, it is the province of the Supreme Court of the United States to confine its decisions to the will of the legislature, if that will has been clearly expressed. Foster and Elam v. Neilson, 2 Peters, 307. United States v. Arredondo, 6 Peters, 710.

A treaty of cession is a deed of the ceded territory ; the sovereign is the grantor, and the act is his ; so far as relates to the cession the treaty is his act and deed, and all courts must so consider it ; and deeds are construed in equity by the rules of law. Ibid. 738.

The Spanish version of the Florida treaty was in the words of the king, and expressed his intention ; and though the American version showed the intention of the American government to be different, the Supreme Court cannot adopt it to decide what was granted by the king of Spain, what accepted and what reserved : the rules of law are too imperative to be disregarded or mistaken. The true interpretation of the Spanish language of the treaty is, that the grants of lands in Florida, made before the treaty, except those especially excepted, is that these grants remain confirmed.—The proprietors of such grants could bring suits to recover them without any action of Congress ; and any question arising would be purely a judicial question. Ibid. 741.

The object of the treaty with Spain, which ceded Florida to the United States, dated 22d May, 1819, was to invest the commissioners with full power and authority to receive, examine, and decide upon the amount and validity of asserted claims upon Spain, for damages and injuries. Their decision, within the scope of this authority, is conclusive and final, and is not re-examinable. The parties must abide by it, as the decree of a competent tribunal of exclusive jurisdiction. A rejected claim cannot be brought again under review in any judicial tribunal. But it does not naturally follow that this authority extends to adjust all conflicting rights, of different citizens, to the fund so awarded. The commissioners are to look to the original claim for damages and injuries against Spain itself ; and it is wholly immaterial, who is the legal or equitable owner of the claim, provided he is an American citizen. Comegys et al. v. Vasse, 1 Peters, 212.

After the validity and amount of the claim has been ascertained by the award of the commissioners, the rights of the claimant to the fund, which has passed into his hands and those of others, are left to the ordinary course of judicial proceedings, in the established courts of justice. Ibid. 212.

The treaty with Spain recognised an existing right in the aggrieved parties to compensation ; and did not, in the most remote degree, turn upon the notion of donation or gratuity. It was demanded by our government as matter of right, and as such was granted by Spain. Ibid. 217.

Even in cases of conquest, it is very unusual for the conqueror to do more than to displace the sovereign and assume dominion over the country. The modern usage of nations, which has become law, would be violated ; that sense of justice and of right, which is acknowledged and felt by the whole civilized world, would be outraged, if private property should be generally confiscated, and private rights annulled on a change in the sovereignty of the country, by the Florida treaty. The people change their allegiance, their relation to their ancient sovereign is dissolved ; but their relations to each other and their rights of property remain undisturbed. Had Florida changed its sovereign by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new government would have been unaffected by the change. It would have remained the same as under the ancient sovereign. United States v. Porcheman, 7 Peters 5½. -

The language of the second article of the treaty between the United States and Spain, of 22d February, 1819, by which Florida was ceded to the United States, conforms to this general principle. Ibid.

The eighth article of the treaty must be intended to stipulate expressly for the security to private property, which the laws and usages of nations would, without express stipulation, have conferred. No construction which would impair that security, further than its positive words require, would seem to be admissible. Without it, the titles of individuals would remain as valid under the new government as they were under the old. And those titles, so far at least as they were consummated, might be asserted in the courts of the United States, independently of this article. Ibid.

The treaty was drawn up in the Spanish as well as in the English languages. Both are original, and were unquestionably intended by the parties to be identical. The Spanish has been translated ; and it is now understood that the article expressed in that language is that : the grants shall remain ratified and confirmed to the persons in possession of them, to the same extent," &c. ; thus conforming exactly to the universally received law of nations. Ibid.

If the English and Spanish part can, without violence, be made to agree, that construction which establishes this conformity ought to prevail. Ibid.

No violence is done to the language of the treaty by construction which conforms the English and Spanish to each other. Although the words " shall be ratified and confirmed," are properly words of

3 H

east and west
Florida.

United States be, and he is hereby, authorized to take possession of, and occupy, the territories of east and west Florida, and the appendages and appurtenances thereof; and to remove and transport the officers and soldiers of the king of Spain, being there, to the Havanna, agreeably to the stipulations of the treaty between the United States and Spain, concluded at Washington, on the twenty-second day of February, in the year one thousand eight hundred and nineteen, providing for the cession

And remove
Spanish troops,
according to
treaty.

contract, stipulating for some future legislation, they are not necessarily so.  They may import that "they shall be ratified and confirmed" by force of the instrument itself.  When it is observed that in the counterpart of the same treaty, executed at the same time, by the same parties, they are used in this sense, the construction is proper, if not unavoidable.  *Ibid.*

In the case of Foster and Elam *v.* Neilson, 2 Peters, 253, the Supreme Court considered those words importing a contract.  The Spanish part of the treaty was not then brought into view, and it was then supposed there was no variance between them.  It was not supposed that there was even a formal difference of expression in the same instrument, drawn up in the language of each party.  Had this circumstance been known, it is believed it would have produced the construction which is now given to the article.  *Ibid.*

By the law of nations, the inhabitants, citizens, or subjects of a conquered or ceded country, territory, or province, retain all the rights of property which have not been taken from them by the orders of the conqueror; and this is the rule by which we must test its efficacy according to the act of Congress, which we must consider as of binding authority.  United States *v.* Clarke, 9 Peters, 168.

A treaty of cession is a deed or grant by one sovereign to another, which transferred nothing to which he had no right of property; and only such right as he owned, and could convey to the grantee.  By the treaty with Spain, the United States acquired no lands in Florida to which any person had lawfully obtained such a right, by a perfect or inchoate title, that this court could consider it as property under the second article; or which had, according to the stipulations of the eighth article of the treaty, been granted by the lawful authorities of the king; which words, grants, or concessions, were to be construed in their broadest sense, so as to comprehend all lawful acts which operated to transfer a right of property, perfect or imperfect.  *Ibid.*

The effect of the clauses of the confirmation of grants made was, that they confirmed them presently on the ratification of the treaty, to those in possession of the lands; which was declared to be, that legal seisin and possession which follows title, is co-extensive with the right, and continues till it is ousted by an actual adverse possession, as contradistinguished from residence and occupation.  *Ibid.*

The United States, by accepting the cession under the terms of the eighth article, and the ratification by the king, with an exception of the three annulled grants to Allegon, Punon Rostro, and Vargas, can make no other exceptions of grants made by the lawful authorities of the king.  *Ibid.*

The meaning of the words lawful authorities, in the eighth article, or competent authorities in the ratification, must be taken to be, "by those persons who exercised the granting power by the authority of the crown."  The eighth article expressly recognises the existence of these lawful authorities in the ceded territories, designating the governor or intendant, as the case might be, as invested with such authority: which is to be deemed competent till the contrary is made to appear.  *Ibid.*

By "the law of Spain" is to be understood the will of the king expressed in his orders, or by his authority, evidenced by the acts themselves; or by such usage and customs in the province as may be presumed to have emanated from the king, or to have been sanctioned by him, as existing authorized local laws.  *Ibid.*

In addition to the established principles heretofore laid down by this court as the legal effect of an usage or custom, there is one which is peculiarly appropriate to this case.  The act of Congress giving jurisdiction to this court to adjudicate on these causes, contains this clause in reference to grants, &c., "which was protected and secured by the treaty, and which might have been perfected into a complete title, under and in conformity to the laws, usages and customs of the government under which the same originated."  This is an express recognition of any known and established usage or custom in the Spanish provinces, in relation to the grants of land, and the title thereto, which brings them within a well established rule of law: that a custom or usage, saved and preserved by a statute, has the force of an express statute, and shall control all affirmative statutes in opposition, though it must yield to the authority of negative ones, which forbid an act authorized by a custom or usage thus saved and protected; and this is the rule by which its efficacy must be tested, according to the act of Congress, which must be considered of binding authority.  *Ibid.*

By the eighth article of the treaty ceding Florida to the United States, the same time is allowed to the owners of land granted under the authority of Spain, to fulfil the conditions of their grants, after the date of the treaty as was limited in the grants.  It has been decided by this court, in the case of Arredondo, that as to individual rights, the treaty is to be considered as dated at its ratification. United States *v.* Sibbald, 10 Peters, 313.

It has been decided, in Arredondo's case, that that provision of the treaty as to the performance of the conditions in grants, is not confined to owners of land by occupancy or residence; but extends to persons who have a legal seisin and possession of land, in virtue of a grant; and that, in the situation of the province, and the claimants to land at the time of the cession, it was enough that they should show a performance of the conditions *cy pres.*  *Ibid.*

In the construction of the Florida treaty, it is admitted that the United States succeeds to all those equitable obligations which we are to suppose would have influenced his Catholic majesty, to secure their property to his subjects, and which would have been applied by him in the construction of a conditional grant, to make it absolute; and further, that the United States must maintain the rights of property under it, by applying the laws and customs by which those rights were secured, before Florida was ceded; or by which an inchoate right of property would, by those laws and customs, have been adjudicated by the Spanish authority to have become a perfect right.  United States *v.* Mills' Heirs, 12 Peters, 215.

Case 1:99-cv-09095-KLR   Document 1   Entered on FLSD Docket 12/20/1999   Page 32 of 64

of said territories to the United States; and he may, for these purposes, and in order to maintain in said territories the authority of the United States, employ any part of the army and navy of the United States, and the militia of any state or territory, which he may deem necessary.

*May employ the army, navy, and militia.*

SEC. 2. *And be it further enacted,* That, until the end of the first session of the next Congress, unless provision for the temporary government of said territories be sooner made by Congress, all the military, civil, and judicial, powers exercised by the officers of the existing government of the same territories, shall be vested in such person and persons, and shall be exercised in such manner, as the President of the United [States] shall direct, for the maintaining the inhabitants of said territories in the free enjoyment of their liberty, property, and religion; and the laws of the United States relating to the revenue and its collection, subject to the modification stipulated by the fifteenth article of the said treaty, in favour of Spanish vessels and their cargoes, and the laws relating to the importation of persons of colour, shall be extended to the said territories. And the President of the United States shall be, and he is hereby, authorized within the term aforesaid, to establish such districts for the collection of the revenue, and during the recess of Congress, to appoint such officers, whose commissions shall expire at the end of the next session of Congress, to enforce the said laws, as to him shall seem expedient.

*Organization of government, as the President may direct.*

*Revenue laws, and laws prohibiting the importation of persons of colour, to be in force.*
*President authorised to establish collection districts, and appoint officers.*

SEC. 3. *And be it further enacted,* That the President of the United States be, and he is hereby, authorized to appoint, during the recess of the Senate, a commissioner and surveyor, whose commissions shall expire at the end of the next session of Congress, to meet the commissioner and surveyor who may be appointed on the part of Spain, for the purposes stipulated in the fourth article of said treaty; and that the President be, and he is hereby, further authorized to take all other measures which he shall judge proper, for carrying into effect the stipulations of the said fourth article.

*President to appoint a commissioner and surveyor, &c.*

*President may take all other measures necessary, &c.*

SEC. 4. *And be it further enacted,* That a board of three commissioners shall be appointed, conformably to the stipulations of the eleventh article of the said treaty: and the President of the United States is hereby authorized to take any measures which he may deem expedient for organizing the said board of commissioners, and, for this purpose, may appoint a secretary well versed in the French and Spanish languages, and a clerk; which appointments, if made during the recess of the Senate, shall, at the next meeting of that body, be subject to nomination for their advice and consent.

*Board of three commissioners, according to 11th article of the treaty.*
*President may organize the board.*
*Secretary.*
*Clerk.*

SEC. 5. *And be it further enacted,* That the compensation of the respective officers, for whose appointment provision is made by this act, shall not exceed the following sums:

*Compensation.*

The commissioner to be appointed conformably to the fourth article, at the rate, by the year, of three thousand dollars.

*Of commissioner under the 4th article.*

To the surveyor, two thousand dollars.

*Of surveyor.*

To each of the three commissioners to be appointed conformably to the eleventh article of the treaty, three thousand dollars.

*Of the commissioners under the 11th article.*

To the secretary of the board, two thousand dollars.

*Of the secretary.*

To one clerk, one thousand five hundred dollars.

*Clerk.*

SEC. 6. *And be it further enacted,* That, for carrying this act into execution, the sum of one hundred thousand dollars be, and hereby is, appropriated, to be taken from any moneys in the treasury not otherwise appropriated.

*100,000 dollars for carrying this act into execution.*

APPROVED, March 3, 1821.

offices established by this act, to such suitable place, within the district for which it was established, as he shall judge most proper.

Sec. 5. *And be it further enacted,* That each of the registers of the land office, and receivers of public moneys, shall receive five dollars for each day's attendance in superintending the public sales in their respective districts.

Approved, March 3, 1819.

Compensation to such register and receiver.

---

Statute II.

Chap. XCIII.—*An Act to authorize the President of the United States to take possession of East and West Florida, and establish a temporary government therein.* (a)

March 3, 1819.

[Obsolete.]

Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, That the President of the

Act of March 3, 1821, ch. 39.

(a) The acts passed relating to the territory of Florida have been :—

An act to authorize the President of the United States to take possession of east and west Florida, and establish a temporary government therein, March 3, 1819, ch. 93.

An act for carrying into execution the treaty between the United States and Spain, concluded at Washington on the 22d day of February, 1819, March 3, 1821, ch. 39.

An act for establishing a territorial government in the territory of Florida, March 30, 1822, ch. 13.

An act to amend an act entitled "An act for the establishment of a territorial government in the territory of Florida," and for other purposes, March 3, 1823, ch. 28.

An Act to amend an act entitled "An act to amend an act for the establishment of a territorial government in the territory of Florida, and for other purposes," May 26, 1824, ch. 163.

An act granting donation lands to certain actual settlers in the territory of Florida, May 26, 1824, ch. 164.

An act authorizing the President of the United States to run and mark a line dividing the territory of Florida from the state of Georgia, May 4, 1826, ch. 31.

An act to amend the several acts for the establishment of a territorial government in Florida, May 15, 1826, ch. 46. Act of March 22, 1832, ch. 52.

An act to carry into effect the ninth article of the treaty concluded between the United States and Spain on the twenty-second day of February, one thousand eight hundred and nineteen, March 3, 1823, ch. 35.

An act for ascertaining claims and titles to lands within the territory of Florida, May 8, 1822, ch. 129.

An act amending and supplementary to "An act for ascertaining claims and titles to land in the territory of Florida," and to provide for the survey and disposal of the public lands in Florida, March 3, 1823, ch. 29.

An act to extend the time limited for the settlement of private land claims in Florida, Feb. 28, 1824, ch. 25.

An act to extend the time for the settlement of private land claims in the territory of Florida and to provide for the preservation of the public archives in said territory, and for the relief of John Johnson, March 3, 1825, ch. 53.

An act giving the right of pre-emption in the purchase of lands to certain settlers in the states of Alabama, Mississippi, and the territory of Florida, April 22, 1826, ch. 29.

An act to provide for the confirmation and settlement of private land claims in East Florida, and for other purposes, Feb. 3, 1827, ch. 9.

An act confirming claims to lots in the town of Mobile, and to lands in the former province of West Florida, which claims have been reported favourably on by the commissioners appointed by the United States, May 8, 1822, ch. 122.

An act for ascertaining the claims to lands within the territory of Florida, May 8, 1822, ch. 129.

An act to confirm the reports of the commissioners for ascertaining claims and titles to land in West Florida, and for other purposes, April 22, 1826, ch. 29.

An act supplementary to the several acts providing for the settlement and confirmation of land claims in Florida, May 23, 1828, ch. 70.

An act to provide for the settlement of land claims in Florida, May 26, 1830, ch. 106.

An act to ascertain and mark the line between the state of Alabama and the territory of Florida, and the northern boundary of the state of Illinois, and for other purposes, March 2, 1831, ch. 86.

An act to equalize the representation in the territory of Florida, and for other purposes, June 13, 1834, ch. 46.

Resolution authorizing the President to furnish rations to certain volunteers of Florida, Feb. 1, 1836.

An act to re-organize the legislative council of Florida, and for other purposes, July 7, 1838, ch. 163.

An act to provide for the armed occupation and settlement of the unsettled part of the peninsula of East Florida, August 4, 1842, ch. 122.

An act to establish an additional land district in Florida, Aug. 30, 1842, ch. 271.

An act to amend an act to provide for the armed occupation and settlement of the unsettled parts of East Florida, June 15, 1844, ch. 71.

An act for the admission of the States of Iowa and Florida into the Union, March 3, 1845, ch. 48.

An act supplemental to the act for the admission of Florida and Iowa into the Union, and for other purposes, March 3, 1845, ch. 75 and ch. 76.

**The President authorized to take possession of East and West Florida, &c.**

United States be, and he is hereby, authorized to take possession of, and occupy, the territories of East and West Florida, and the appendages and appurtenances thereof; and to remove and transport the officers and soldiers of the king of Spain, being there, to the Havana, agreeably to the stipulations of a treaty between the United States and Spain, executed at Washington, on the twenty-second day of February, in the year one thousand eight hundred and nineteen, providing for the cession of said territories to the United States; and he may, for these purposes, and in order to maintain in said territories the authority of the United States, employ

**He may employ the army, navy, and militia.**

any part of the army and navy of the United States, and the militia of any state or territory which he may deem necessary.

**The President to appoint officers, and prescribe the manner of government of the territories.**

SEC. 2. *And be it further enacted*, That, until the end of the first session of the next Congress, unless provision for the temporary government of said territories be sooner made by Congress, all the military, civil, and judicial, powers, exercised by the officers of the existing government of the same territories, shall be vested in such person and persons, and shall be exercised in such manner, as the President of the United States shall direct, for the maintaining the inhabitants of said territories in the free enjoyment of their liberty, property, and religion; and the laws of the United States, relative to the collection of revenue, and the importation of persons of colour, shall be extended to the said territories; and the President of the United States shall be, and he is hereby, authorized, within the term aforesaid, to establish such districts, for the collection of the revenue, and, during the recess of Congress, to appoint such officers, whose commissions shall expire at the end of the next session of Congress, to enforce the said laws, as to him shall seem expedient.

**Revenue laws, and laws concerning the slave trade, extended to the territories.**

**President to establish districts and appoint officers of the customs.**

**Appropriation.**

SEC. 3. *And be it further enacted*, That the sum of twenty thousand dollars is hereby appropriated for the purpose of carrying this act into effect, to be paid out of any moneys in the treasury not otherwise appropriated, and to be applied under the direction of the President of the United States.

**When this act shall take effect.**

SEC. 4. *And be it further enacted*, That this act shall take effect, and be in force, whenever the aforesaid treaty, providing for the cession of said territories to the United States, shall have been ratified by the king of Spain, and the ratifications exchanged, and the king of Spain shall be ready to surrender said territory to the United States, according to the provisions of said treaty.

APPROVED, March 3, 1819.

---

STATUTE II.

March 3, 1819.    CHAP. XCIV.—*An Act concerning the allowance of pensions upon a relinquishment of bounty lands.*

**The 2d section of the act of 16th April, 1816, ch. 55, &c. continued in force.**

**Act of March 3, 1817, ch. 107.**

Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, That the second section of the act making further provision for military services during the late war, and for other purposes, approved April sixteenth, one thousand eight hundred and sixteen, and so much of the act to amend the same, approved March third, one thousand eight hundred and seventeen, as relates to the subject of that section, shall be continued in force for the term of three years from and after the passing of this act: *Provided, nevertheless*,

**Proviso.**

That no pension shall be granted under the said acts, after the sixteenth day of April next, unless, at the time of relinquishing the bounty land, in the manner therein described, the children, for whose benefit the same may be granted, or one of them, shall be under sixteen years of age:

**Proviso.**

*And provided also*, That the pensions shall commence at the date of the relinquishments respectively.

APPROVED, March 3, 1819.



# Spanish Pathways in Florida: 1492 – 1992

# Los Caminos Españoles en La Florida: 1492 – 1992

Edited by Ann L. Henderson and Gary R. Mormino

Ann L. Henderson y Gary R. Mormino Editores

Translated by Carlos J. Cano, José A. Feliciano-Butler, and Warren Hampton

Traducción de Carlos J. Cano, José A. Feliciano-Butler, y Warren Hampton



in original en 1493
Colón describiendo
ubrimientos para
nismas Altezas,"
Isabel.



Pineapple Press, Inc.
Sarasota, Florida

Gabriel de Rivas and Maria Moreno, his father's sister. In the 1820 Spanish census of Pensacola, Fernando is listed as a civil servant; it appears that he had returned to the medical profession. He is also identified as single, suggesting that his wife had probably died before the census was taken. Fernando owned considerable property in and around Pensacola and became involved in the sale of several large tracts of land, one of which will be discussed shortly. In 1824, Fernando was recommended to serve as an alderman for Pensacola but instead was appointed to the board of health. Three years later, in 1827, he reported on the sickness in Pensacola. He moved to Mobile for a time — he was a member and director of the Spanish Benevolent Society there in 1838 — but later returned to Pensacola, where there are references to Dr. Moreno as late as 1845. His library of about 100 volumes is now located in the John C. Pace Library at the University of West Florida, a gift of the estate of Miss B. A. Murphy.

Arthur, born in 1791, must have died young as there are no references to him after that date.

Virtually nothing is known of Andres after his birth in 1797 until the 1920 census of Pensacola. The census lists him as single and a civil servant, like his brother Fernando.

Fernando, Arthur, and Andres apparently had no offspring; at least we have no record of any. But Francisco, born November 25, 1792, more than made up for all of them.

### Growth of Pensacola

Since Fernando and his sons spent most of their lives in Pensacola, it might be well to say a few words about their hometown. Following the British evacuation of Pensacola in the summer of 1781, Pensacola became a Spanish-French city. The new residents — they numbered some 500 to 600 until about 1803 — occupied the houses left by the British, which consisted of two basic types: the galleried multi-room house and simple modest cottages. The latter were primarily single-story wooden structures with porches facing the street. The structure which frequently replaced the old British house, the Creole cottage, typified Gulf coast architecture of the day. Three considerations dictated the construction of this vernacular housing: the weather, the economy, and the large number of Frenchmen from the Gulf coast and Caribbean living in Pensacola. Commonplace features of these homes included fireplaces, recessed railed verandas, and gabled roofs. Even at the city's peak from 1810 to 1821, Pensacola's houses numbered only about 180 to 210; many of them were multi-family dwellings. The Moreno family owned several of these cottages.

With the sale of Louisiana to the United States in 1803, Pensacola swelled to a reported population of between 1,000 and 3,000 in 1813. The population then declined to 600 or 700 in 1820, not including several

Born in Pensacola in 1
Mallory was the elde
1836, she married Step
lawyer, later elected
Confederate Secretar
lived in Key West, Pens
and Rich

204 THE MORENO FAMILY OF THE GULF COAST



hundred or more slaves. Taverns, billiard parlors, barbershops, butcher shops, and stores dominated the commercial establishments in town, while several sawmills, a brickyard, and a tannery existed on the city's periphery.

The most popular sport for the men was billiards. Dancing and gambling were also popular pastimes. The Tivoli dance hall — later the Hotel de Paris owned by Francisco Moreno — also had rooms for card-playing and gaming. From all accounts, Pensacolans loved to gamble. This was the Pensacola in which Francisco Moreno lived and raised his families.

For several years, Francisco apparently farmed the large tract of land given to him and Fernando in 1810. In 1815, he married Doña Josefa López, the legitimate daughter of Don Joseph Anthony López, by then deceased, and Doña Maria Victoria Calder. In the same year, Josefa gave birth to a daughter, Angela. In 1817, a son, Francisco Jr. was born and the following year a daughter, Josefa, appeared. Unfortunately, both Francisco's wife and daughter, the two Josefas, died in 1820. Thus only two of Francisco's children, who were born before July 17, 1821 (the date Andrew Jackson accepted the transfer of Spanish West Florida to the United States), survived the Spanish era in Pensacola history. However, Francisco married twice after his first wife's death. He married her sister, Margarita Eleutaria, who bore twelve children between 1822 and 1851, when she died. He then married seventeen-year-old Mentoria González in 1852, and she gave birth to twelve more children between 1853 and 1873. Eight of Francisco's twenty-seven children died young. That left nineteen of them to reach adulthood.

It is difficult to separate fact from fiction about Don Francisco. It is said that about 1828, Francisco and his brother Fernando sold their 800 arpents of land near Fort San Carlos de Barrancas to the U.S. government for $3,000. The land became a part of the U.S. Navy Yard and is a part of the Pensacola Naval Air Station to this day. Francisco apparently used his share of the money to become Pensacola's first banker. He kept his money in a chest that he hid under his bed. When he made a loan, the money — supposedly only gold — came from this chest. The chest is now on display in the Moreno room of the Walton House in Pensacola. He also bought and sold large amounts of land in and around Pensacola. He may have opened the first hotel in the city, the Hôtel de Paris. In 1836, he became the Spanish consul for Pensacola, a post he held until the end of the Civil War. He also owned a number of slaves: in 1850, he owned twenty-one slaves; in 1860, he owned thirty slaves. After emancipation, three of the slaves elected to remain with the Moreno family — Old Mose, Uncle Dick, and Teresa. Francisco's social and financial status was such that he was often referred to as the King of Pensacola.

Thirteen of Francisco's sons, sons-in-law, and grandsons served the Confederate cause. Two were killed in combat: Lieutenant Francisco

# THE
# OLDEST CITY



# ST. AUGUSTINE
## SAGA OF SURVIVAL

*Edited by Jean Parker Waterbury*

AUTHORS

George E. Buker • Amy Bushnell • Robert N. Dow Jr.
Thomas Graham • John W. Griffin
Patricia C. Griffin • Daniel L. Schafer • Jean Parker Waterbury

Copyright 1983 by the St. Augustine Historical Society
Published in the United States by the St. Augustine Historical
Society

Library of Congress Catalogue Card Number: 83-50479

Manufactured in the United States of America
First edition

Cover design: Joseph S. Mark
ISBN 0-961-2744-0-9 pbk.

ISBN 0-961-2744-1-7

Illustratio

The Cont

Preface . .

Chapter C
7
8
b

Chapter T
T
1:
b

Chapter T
T
16
by

Chapter Fc
.
17(
by

Chapter Fiv
Th
178
by

Chapter Six
The
182:
by (

Chapter Seve
The
1865
by T

Chapter Eigh
Yeste
1913
by R

Major Sources

Index . . . . . . .

Case 0:99-cv-09095-KLR   Document 1   Entered on FLSD Docket 12/29/1999   Page 40 of 64

Island. Two soaring spires decorated with orange terra-cotta ornamentation flanked the hotel's central dome, adding a final touch of lofty majesty to the whole creation.

Magnificent though it was, the Hotel Ponce de Leon was only the centerpiece of a whole program of additions and alterations Flagler planned for St. Augustine. Across the way from the Ponce de Leon, also on filled land, he built the Alcazar, a smaller hotel which offered slightly more modest accommodations for the overflow from his major hotel. The Alcazar also contained an arcade of shops for the hotel's guests, and to the rear there was an elaborate health and entertainment casino. The Casino contained a large indoor swimming pool, several types of therapeutic baths, steam rooms, a gymnasium, bowling alley and dance floor. The Alcazar continued Carrere and Hastings' Spanish Renaissance architecture, making it a fitting complement to the Ponce de Leon.

Franklin W. Smith entered into the spirit of the moment by erecting the Casa Monica Hotel just across Cordova Street from Flagler's hotels. The walls of Smith's exuberant medieval Moorish castle were of the same cast concrete as the Ponce de Leon and Alcazar and his own Villa Zorayda. Inside was a large, glassed-over patio, the Sun Room, where winter chills were completely banished. The effort to complete the hotel, however, proved too much for Smith's finances, and he sold out to Flagler, who renamed the hotel the Cordova and added it to his enterprises.

To insure that guests could reach his hotels, which were, after all, on the edge of the Florida frontier, Flagler purchased the railroad running north from St. Augustine to the St. Johns River and built the first bridge across the river to connect with the rail lines from the north. Henceforth, a traveler could step out of the dismal, frigid weather of New York City into a Pullman "palace" car and thirty-five hours later step out into the warm sunshine and blossoming flowers at Flagler's new railroad station in St. Augustine. The magic of changing winter into spring overnight captured the imagination of the winter-bound north and set the Florida tourist industry booming.

From the rail depot travelers went to the hotels in brightly



The Spanish
built by Henr
Street, the Al
Moorish arc
triumvirate.

orange terra-cotta
me, adding a final
n.

de Leon was only
ions and alterations
the way from the
Alcazar, a smaller
commodations for
r also contained an
the rear there was
. The Casino con-
al types of thera-
owling alley and
re and Hastings'
a fitting comple-

f the moment by
dova Street from
t medieval Moor-
e Ponce de Leon
ide was a large,
inter chills were
e hotel, however,
ld out to Flagler,
added it to his

hich were, after
r purchased the
St. Johns River
ect with the rail
d step out of the
ullman "palace"
warm sunshine
d station in St.
pring overnight
orth and set the

tels in brightly





The Spanish Renaissance Hotel Ponce de Leon (top) was the first
built by Henry M. Flagler, opening in 1888. A year later, across King
Street, the Alcazar (lower right) welcomed guests. The Cordova, of
Moorish architecture (lower left) completed the luxurious
triumvirate.

artificially conduced, then tripled in the frenzy of demand.

One January 1925 copy of *The Palm Beach Post*, 150 pages fat, contained 12 full-page advertisements in a row for developments.

This was the era of the grand hotels: The El Verano (1923, later the George Washington and now the Helen Wilkes in West Palm Beach), The new Breakers hotel (1926), Mizner's Cloister Inn (forerunner to the Boca Resort and Club, 1926), the Gullstream in Lake Worth (1925), the Pelican in Stuart (1925).

And new schools, new hospitals, new theaters, new roads.

Property values in West Palm Beach increased from $13.6 million to $61 million in just five years, from 1920 to 1925.

But by the end of 1925, runaway real-estate speculation promised an end to the boom. And soon, two hurricanes would seal South Florida's fate.



Museum of the City of Lake Worth

**LAND FOR SALE:** *Many early arrivals to Lake Worth were from the Midwest, lured by the Chicago team of Harold J. Bryant and William F. Greenwood. In 1912, one could purchase a $250 contract that included one tract of farmland (of 5 to 40 acres) and one townsite on Lake Worth.*

**PLEASURE PALACE:** *The Lake Worth Casino opened in 1922 with a saltwater pool and diving towers, shops, restaurants, a tunnel walkway to the ocean (at left) and gambling casino.*

Museum of the City of Lake Worth

'Here is a city of the sun. Here is a city of summer breeze, an environment of Eden.

And here is health and happiness and prosperity for those who listen to its call.

And this city's people, content in the pure joy of living, bid you come and make your home among them.'

— Introduction to a special West Palm Beach edition of The Palm Beach Post, October 1922

# High court strikes broadcast ad ban on casino gambling

**By Linda Greenhouse**
*The New York Times*

WASHINGTON — The Supreme Court Monday unanimously struck down a 65-year-old ban on broadcast advertising of casino gambling, ruling on First Amendment grounds that the federal law "sacrifices an intolerable amount of truthful speech about lawful conduct."

The decision, reflecting the court's growing solicitude for advertising and other forms of commercial speech, was a major victory for the casino industry and for broadcasters, who have challenged the ban in cases from Atlantic City, N.J., to Las Vegas. The case Monday was from New Orleans, where a group of broadcasters sued the federal government for the right to carry advertising for casino gambling in Louisiana and Mississippi.

Broadcasters, along with the commercial gambling industry, have grown increasingly restive under the advertising prohibition because Congress amended the law in 1988 to permit gambling advertising by casinos owned by Indian tribes. That meant, for example, that the Mashantucket Pequot Indians in Connecticut could advertise gambling in their popular Foxwoods casino to the New York radio and television market, but that the casinos in Atlantic City could not advertise gambling. The restrictions permitted general advertising of casinos as vacation destinations.

In striking down the ban Monday, the court focused on the irrationality of making distinctions among advertisers, while at the same time suggesting that a more uniform and "coherent" policy of advertising restrictions might well have been upheld.

That analysis, which ratified the court's current approach to commercial speech, left the door open for the court to uphold, in future cases, restrictions on the advertising of other lawful products, such as tobacco. In its next term, the court will decide whether the Food and Drug Administration, which has proposed broad restrictions on cigarette advertising, has jurisdiction to regulate tobacco products.

Writing for the court on Monday, Justice John Paul Stevens said that while the government's interests were valid, and theoretically defensible, the law as it exists "is so pierced by exemptions and inconsistencies" that good intentions could not salvage it or "overcome the presumption that the speaker and the audience, not the government, should be left to assess the value of accurate and nonmisleading information about lawful conduct."

## The court also:

■ Said it will decide whether computers and other instructional materials paid for with taxpayer money can be used by religious schools. The court's decision in a Louisiana case could affect the national debate over school vouchers — financial help from the government for families whose children attend religious and other private schools.

■ Allowed the Equal Employment Opportunity Commission to order other federal agencies to pay damages to employees they discriminate against. The 5-4 ruling said the EEOC can require agencies to pay compensatory damages, intended to reimburse for harm such as emotional distress.

■ Turned down an appeal by Operation Rescue founder Randall Terry and other anti-abortion activists, who challenged nearly $600,000 in fines and lawyer fees they were ordered to pay following a campaign to block New York City-area abortion clinics a decade ago.

# Casinos and Indians

BY Charles Flowers

**Despite prohibitions against gambling in Florida, the independent nation of the Miccosukee Indian is raking in revenue from its Everglades casino operations. Now the game is being ratcheted up a notch, with a resort-hotel complex coming on line in 1999. But can the tribe's culture survive, and what sort of deal will it cut with the State of Florida?**

The stage was simplicity itself: Bill Cosby, consummate comedian, television father and role model of patience, was losing his. The problem was his microphone, a hand-held wireless traitor that was picking up faint but audible voices from the damp Everglades air. It could have been Rick Sanchez reading the news on Channel 7. Or the rapid voice-over of the deejay on Radio Ritmo. Maybe a commercial from Potamkin Toyota creeping in. Cosby tried to work the problem into his stand-up act, effecting a kind of cinematic Indian-speak.

"My people want one sound," he grunted helplessly to the Miccosukee sound engineers at one point. "Not many sounds." He dropped a second offending microphone on stage with a loud clunk and walked away from it. Finally, realizing the problem was not going to be fixed, he pressed on to a conclusion. He then thanked his $50-a-ticket audience and disappeared into a dressing room. The 1,500 or so audience members trooped next door to the casino.

Object lesson in this swampy sector: Things are looking up on the Miccosukee Reservation. But not all the bugs have been worked out.



Miccosukee Tribal
Chairman Billy
Cypress and his
gambling oasis in
the Everglades

PHOTO ILLUSTRATION RUPERT WHITEHROTTOM

*TRUMP RULES SEBASTIAN LIGHTNING PICTURES* (handwritten)

**H**eading west on Tamiami Trail, houses give way to widely-spaced strip shopping centers. Somewhere past Sweetwater, Great Blue and White Herons stalk the edges of the C-4 canal, fishing the shallows. Anhingas hang on the branches, drying their glistening black wings in the sun, like beach towels with brains. For many Miamians, this is Out There.

At Dade Crossing, where the Trail meets Krome Avenue, you take a right then the first left. Here lies Miccosukee Indian Gaming, a casino with a 2,000-seat domed amphitheater next door. Coming from the west, the edifice is the first hint of the Miami skyline to come. By next summer, the casino will melt into a nine-story, $45 million resort hotel; a mirage in the Everglades.

Up close, you notice that the valet speaks Spanish. That's because 75 percent of his customers – the casino traffic – is Hispanic. The second thing you notice, in the darkened arcade at the heart of this complex, is the hum of 500 video game-style slot machines. Close your eyes, and you can hear the mantra of self-sufficiency.



Miccosukee tribe chief counsel Dexter Lehtinen

In the early years since it opened, Miccosukee Indian Gaming has made the 389-member Miccosukee Indian Tribe a major player in the economics of West Dade. The untaxed proceeds from the slot machine/bingo/poker business have transformed the small tribe relatively quickly. Once Florida's most traditional Indians, Miccosukees now own $150,000 houses and drive luxury cars. Former chickee-dwellers, they are rich enough to successfully sue the National Park Service (for more land to build on) and the State of Florida (for cleaner water to fish in). In purely economic terms, it's a good time to be a Miccosukee.

The tribe is also a major employer. With more than 500 casino employees at present, jobs are projected to double when the hotel opens in June of 1999. A creation of Minneapolis-based developer ICI, the resort's 302 rooms will make it the biggest hotel in Miami-Dade west of the Florida Turnpike, and competition for resorts as distant as Naples and Fort Myers. It's already the state's leading vendor of lobster tails (the Cafe Hammock restaurant, smack in the middle of the 85,000-square-foot casino, claims it moves 12,000 tails a month as part of its $5.95 surf 'n' turf dinners). But Miccosukee Indian Gaming hopes to become more than a cheap date. It wants to be a destination.

Don't bet against it, says former US Attorney Dexter Lehtinen. The tribe's general counsel, Lehtinen was a leading proponent of the Congressional act that effectively doubled the size of the Miccosukee Reservation, which begins about 18 miles west of the gaming center – to the chagrin of the National Park Service, which failed to realize that 90,000 acres of its so-called wilderness was once Indian Country. Lehtinen's clout extends to Washington and Tallahassee. His wife, Ileana Ros-Lehtinen, is a US Representative from Miami whose

1988 Congressional campaign was managed by one Jeb Bush. Dexter Lehtinen thinks the negotiations could be smoother with Governor-elect Bush than with his predecessor, Lawton Chiles, whose opposition to gambling was almost religious.

"I believe this administration that's going out of office has not confronted, in its own mind, the reality of what Florida is already doing," Lehtinen says over lunch at a Kendall Chinese restaurant. "Slots are already here. They're in the cruise ships, they're in the Publix supermarkets [the machines that sell Florida Lottery tickets]. The Lottery itself is a form of a slot. The commitment of people to treat the tribes fairly, while not adding any new games to Florida, could result in a conclusion that slots should be on the reservations, because slots are already in Florida."

**W**hether Florida Lottery machines can be considered true slots is open to debate. But no one can argue that Indian gaming has arrived as a force to be reckoned with in Florida. It is also part of a national trend that had its beginnings even before Congress passed the Indian Gaming Regulatory Act of 1988.

Gambling on Indian land began in bingo halls in the late 1970s, which raised their limits skyward after the Seminoles successfully challenged then-Broward Sheriff (and now Florida Attorney General) Bob Butterworth in the US Supreme Court. Signed into law by President Bush, the now-controversial IGRA was intended to help Indian Tribes develop economically. Though the profits are spread unevenly among American Indian tribes, favoring smaller ones located near major population centers, the law has generally helped to solve social welfare problems for many Native Americans.

According to a 1998 study by the Economics Research Group (ERG), 23 states have entered into compacts with 144 tribes in the decade since the IGRA was passed. Meanwhile, Indian gaming grew from a $100 million business in 1988 to a $6 billion business by 1996. According to Jonathan Taylor, who directs Indian projects for the Cambridge, Massachusetts-based ERG, Indian gaming elevated those tribes who took it up from "the poorest minority in America, with social problems off the charts," to people with a fighting chance at the middle class.

Few tribes did it more aggressively than the Miccosukees or



The Miccosukees' spot in the Everglades, which will soon include a 302-room hotel in addition to their casino and ringed amphitheater.

*All STATES*    *23 STATES* (handwritten)



**"My people want one sound, not many sounds," said Bill Cosby as he wrestled with an unruly mike picking up radio stations. Cosby is typical of big name entertainment brought to the casino.**



Cypress and the Miccosukees have discovered along with the Seminoles and more than 150 Indian tribes across the county, that nothing throws off cash quite like a casino. It's cleaner than uranium mining or oil drilling, and easier than gigging frogs by the light of the moon. Tucked away from residential areas, the casinos are less invasive than posing for pictures with tourists. And, when compared to waiting for Florida or the US government to fund basic health, housing and education programs, gaming is like the express lane at Publix.

Exactly how much cash is hard to say. The Miccosukee Tribe does not publish an annual report, and Cypress and Lehtinen are tight-lipped on the subject. But if its high-cost entertainment is not considered a revenue source, but rather a loss leader for the casino, Miccosukee Indian Gaming should produce revenues and profits comparable to Hollywood Seminole Gaming. That is the biggest moneymaker of the four Seminole casinos. Managed by the tribe, the Hollywood casino earned almost $85 million last year, on revenues of $138 million.

*$ 85 Million NET / YEAR.*

With such large revenues at stake, the state is naturally interested in taking a cut. Florida is one of only five states where tribes operate without a compact with the governor. (The Mashantucket Pequot Tribal Nation, for example, pays more to Connecticut than any corporation in the state.) A gaming compact between the governor and the two tribes could mean as much as $500 million in new revenues for Florida over four years. The stakes were high enough to prompt casino-magnate Donald Trump to make a $50,000 contribution toward Jeb Bush's victory, and, Trump hopes, a managerial role in Florida Indian casinos.

"If the Miccosukees could negotiate successfully with the state, then Miccosukee Indian Gaming would be expanded by definition," Lehtinen says. "The compact would provide for expanded gaming. But right now the tribe believes it can sustain everything it has based on its current operations."

Even without locking in a program for expansion, the Miccosukees, like the Seminoles, would like a compact with the State of Florida. As it is, Florida can threaten to close down their gaming operations with 30 days notice, though such a move could create a legal mess between the state and federal governments. One outcome could be a state referendum. The only time Indian gaming has been on the ballot of a major state – Proposition 5 in California this November 3 – it passed by nearly two-to-one. But spending by backers and opponents of the measure topped the $100 million mark, a record neither Florida tribe wants to challenge.

As negotiators, the Miccosukee Tribe may be tougher than even the Seminoles, who dropped an 80-page compact proposal on Gov. Chiles' desk last June. The compact offered the state 30 percent of slot machine revenues if the Seminoles' current casinos are given state sanction, a higher percentage if they can expand to new locations. Although the two sides met in Orlando in July, no agreement has been reached.

The Miccosukees, according to Lehtinen, want more. They are not content with the so-called "electronic slots," or pull-tab machines. They want the same kind of slot machines a gambler would find in Las Vegas or Atlantic City, the dreaded one-armed bandits. "The Miccosukees want [true] slots," Lehtinen says. "They are not bargain-

their close kin, the Seminole Tribe of Florida, based in Hollywood. Gaming is now the single biggest source of revenue for both tribes, and the dividends have grown like Microsoft stock during the last decade. On a per capita basis, the Miccosukees are in the lead: Quarterly dividends for Miccosukee tribal members are believed to be in the $8,000 range – $32,000 annually – nearly double the Seminoles annual per capita dividend. With about six times as many enrolled members, however, the 2,500-member Seminoles have a more diversified economy – interests in cattle, citrus and turtle farming, and even an aircraft company – than the Miccosukees. But gaming pays the bills for just about every development initiative, including four gaming centers and Florida's first tribally owned hotel, the Sheraton Four Points Hotel outside of Tampa.

"Gaming is an industry that brings in money," says Miccosukee Tribal Chairman Billy Cypress, who is also former vice-chairman of the National Indian Gaming Association, a lobbying group based in Washington, D.C. "This is what is needed by the Indian communities, because, as you know, the federal government and everybody else says the Indian tribes are probably 20 years behind," he says.

"They are correct," adds Cypress, "because when you have no money, no economic base, you're going to rely on other people to give you help. And the way the economy is today, and the state of the country, most people are struggling. So, with gaming it brings not so much of an even keel, but a chance, which tribes would not

Case 9:98-cv-09905-KLR Document 1 Entered on FLSD Docket 12/29/1999 Page 48 of 64

The good news for the tribe is that the incoming Bush adminis-
tration in Tallahassee may be more helpful to the cause, agrees Al
Chiles. "I expect the new administration to be more intellectually
honest about the true status of the cruise ships and the Lottery,"
Lehtinen says. "Bush has said that he does not expect to expand
gaming in Florida. But if he were more intellectually honest about
what's sitting in Publix, and what's on those cruises to nowhere –
that's where the wiggle room is."





Twenty-three states
have entered into
compacts with 144
tribes in the last
decade. Indian gam-
ing grew from a $100
million business in
1988 to a $6 billion
business by 1996.

If there is one thing that Miccosukee Gaming seeks to avoid, it's
the image of a glorified bingo parlor. Rather, the Miccosukees
want the glamour and glitz of Las Vegas, with attractions like
top sporting events and first-class entertainment. With licensed
child care at $5 an hour, they also want the family audience that Las
Vegas is now attracting.

Much of the Miccosukees' advertising is the creation of JGR &
Associates of Miami, and it has helped put Miccosukee Gaming on
the map. The ads are written in Spanish and English, and aim to
bring in more than the elderly, mostly female, bingo crowd. Sport
fans represent a major target, and the tribe is a major sponsor of the
Dolphins, the Marlins, the Heat and the University of Miami Hurri-
canes. The Miccosukees want gamblers to come watch Hector
"Macho" Camacho box, for example. "We try to do one large,
nationally televised boxing event per month," says marketing direc-
tor Jeff Purcell. "It's big business when ESPN or HBO comes."

For Las Vegas-type entertainment, the tribe brings in major
acts like Bill Cosby, Kenny Rogers and Paul Rodriguez. Even the
ultimate Vegas entertainment icon, Wayne Newton, is scheduled to
perform at Miccosukee Gaming when the first two floors of the
hotel open for business in February. The hotel, like the high-end
entertainment acts, is a deliberate effort to elevate the gambling hall
to a first-class resort.



Buffalo Tiger (above) wants to make
sure Miccosukee traditions are not lost.

"It's a signature hotel –
different from anything
South Florida has seen
before," says Becky
Buster, director of sales
and marketing, who is
married to a Miccosukee
tribal member. "The col-
ors are reflective of the
Miccosukee culture. It's
festive, definitely not
laid-back earth tones.
The designer's inspira-
tion was – believe it or
not – butterfly wings."

Measured in rooms
(302), the new resort
hotel at Miccosukee
Gaming is on par with
many of the new hotels now planned for Miami, including the Man-
darin Oriental on Brickell Key (330 rooms), the Four Seasons on
Brickell Avenue (300 rooms) and the Miami Beach Marriott at
South Beach (239 rooms). But is it a big enough deal to justify the
upscale room rates and five-star dining also planned there?

"I think the Indians are building into a niche," says Stuart
Blumberg, president and CEO of the Greater Miami & the Beaches
Hotel Association. "It's a destination unto itself. You've got eco-
tourism attractions, and you're also within a 25- to 30-minute drive
of South Beach. As far as the hotel goes, I think 300 (rooms) is
about right. Any more than that would be pushing the envelope.
Any less would be too small."

The appearance of Bill Cosby in the dog days of August was
not missed by Blumberg, or others in the Miami hospitality commu-
nity. "When you put Bill Cosby on the Miccosukee Indian Reserva-
tion, you're doing something unique," Blumberg observes.

The land on which Miccosukee Indian Gaming sits is 18 miles
east of the main reservation; its satellite location was written
into the Indian Gaming Regulatory Act of 1988. The place-
ment by the Miccosukees shows "they were a politically astute tribe
long before they were making money, and long before they ever
met me," says Lehtinen.

To get to the Miccosukee Indian Reservation, you must drive
west on Tamiami Trail. Along the way, you will see Indian housing
under construction on the north bank of the canal, and farther west,
the airboat business of Buffalo Tiger.

Tiger, the former chairman of the Miccosukee Tribe, is a living
legend. His sons Lee and Stephen are well-known cultural ambas-
sadors – as a band called Tiger Tiger, and, in Lee's case, as devel-
opers of eco-tourism attractions. Their father is one of the last living
links to the Seminole and Miccosukee medicine men of old, the
keepers of tribal knowledge. At 74, he is a hard-liner, a man who
cares more about preserving Indian culture than how well he gets on
in the "white world."

Today's Miccosukees are descendants of the last holdouts of
the Everglades Indians, tribes which survived deep in the swamps
and refused to surrender to federal troops and be relocated.

Their culture also survived, and began producing income for
the tribe during the Depression days of the 1930s, when the mostly
white owners of Miccosukee tourist camps staged "Indian wed-
dings" and held baby-naming contests. When the Seminole Tribe of
Florida was formed in 1957, the so-called "Trail Indians" did not
accept ballots, and instead gained federal recognition five years
later as the separate Miccosukee.

Now, the wisest of them wonders, can the Miccosukee in them
survive the new onslaught that gaming represents?

As we talk on the deck, the electronic hum of that gaming casi-
no seems more than a few miles away. An alligator rises up, at least
eight feet long. Almost smiling, the alligator is disturbingly close to
the deck and seems amused by people asking stupid questions like,
"Does he bite?"

"Of course," Buffalo Tiger answers. "He's an alligator." Then
he says what may underscore the biggest hope of all for the Micco-
sukee Tribe, bigger than this alligator, or the chance to operate a
full-scale casino resort: "We've got to use that money to save our
culture." ■

*The Gambler: Gus Boulis*

Photo: Jennie Zeiner

# A
# GAMBLING MAN

Sailing the troubled seas

with Gus Boulis, the man who

brought you Miami Subs, fine

dining in the Keys, gambling

boats along the South Florida

coast and a defiant attitude

that has made him a maverick

folk hero.

*By Charles Flowers*

Gus Boulis bounds up the gangway to his Sun-Cruz casino ship like Popeye the Sailor Man on gink-go biloba. The 165-foot ship docked in Hollywood is only half-filled with gamblers, most of whom have headed straight for the $5, all-you-can-eat buffet on the top deck. Clutching a microphone, a crooner backed by a drum machine sings, "You're 16, you're beautiful and you're mine," to a semi-rapt audience that has no members in that demographic.

Boulis, 49, stoops to pick up a plastic cup and disposes of it, catching the eye of a starch-shirted bartender. Hurrying downstairs, Boulis bends to fix a piece of loose molding. At mid-ship, a worker is resurfacing the base of a stairway. Boulis inspects it. "Granite!  We're giving our customers granite," he says proudly. "Nothing but the best for our customers."

Flying by, he works the crowd, embracing elderly women, and clapping the shoulders of one Greg Haun, an octogenarian high roller from Miami who took Boulis for $8,000 in video poker over the past two weeks, and drove up today to maybe get a little more. They are old friends. "When I was young," Haun says, "I looked like a Greek god. Now, I look like a god-damn Greek."

Boulis laughs, is out the door, down the gang-plank, talking to the crew rebuilding the seawall for this super-wide ship Boulis helped design and name. It is officially the SunCruz VI, but he calls it "The Swath." In choppy seas, the twin hulls fill with 15 feet of water to make it as steady as they go. A late-arriving day cruiser is trying to park his red Corvette in a nearly full lot. Boulis tells the valet to angle it in, make it fit. "He wants to pay $5 to park and they're making it difficult for him," Boulis says, amazed.

Boulis runs arguably the most culturally diverse cruise business in South Florida. There are special cruises for Canadians, Israelis, Latin Americans and, of course, Greeks. Every Friday night is a Seafood Fest and every Sunday features a champagne brunch. "Where are they going to find all of this for 10 bucks?" he wonders aloud. "I'm their son, I'm their father, I'm their friend. I create entertainment for them. Safety! Entertainment! Fresh air!"

The captain guns the motor and 351 customers depart for five hours of sun, fun and risky business out beyond the three-mile limit in a place called "nowhere." It is a place they pay $15 (including federal taxes) to visit, plus expenses. It is those expenses – the take from the card games and slot machines – that make up Boulis' profits. The Swath passes through an open drawbridge, leaving the envious land-bound in its wake.

★   ★   ★

His given name is Konstantinos, but it might as well be "Embattled." That's the adjective most use to describe Boulis in the press. More than his legion of lawyers and public relations men, the press has made Boulis a local folk hero. Along with Boulis, himself, of course. Boulis leaves few neutrals in his wake. He is one of that limited breed of entrepreneurial legends South Florida has spawned – people like Mel Fisher and Wayne Huizenga. Boulis started with even less than the chicken rancher-turned-treasure finder, or the garbage man-turned-billionaire. Boulis started ed life in this hemisphere by jumping off a Greek freighter in Halifax, Nova Scotia, and making his way to Toronto where he landed a job as a dishwasher in a submarine sandwich shop. It was 1968. He was 18, on the lam in a country where he did not speak the language. He learned fast.

"He knew very well what was going on," says Laura Males, Boulis' first boss, and current employee. "Some of the draft dodgers we'd hired would be in the back smoking pot, and Gus would be up front doing everybody's job – cutting the meat and talking with the customers. It was obvious he had passion, desire and a dream to go somewhere."

That somewhere was Key West, to develop a chain of 200 Mr. Submarine restaurants that begat Miami Subs. He became CEO of the company known for its extensive menu and undersea murals. It was a place where you could get everything from two Super Burgers for $2 to a bottle of Dom Perignon. He went from dish rags to riches. The American Dream personified.

But lately the dream has taken on nightmarish features, as goblins from all corners of Boulis' world seem out to get him. Once, Boulis was just the target of Monroe County environmentalists, who made sure he was fined for disturbing mangroves and reefs around his Key Largo properties. Now, other hounds have joined in the chase.

Old connections have a habit of re-entering Boulis' life. After re-connecting with Boulis at Stan's waterfront bar and restaurant in Fort Lauderdale 30 years after Toronto, Males went to work for him in Key Largo. She manages a 92-foot SunCruz boat on that island, where Boulis owns three resorts – the Marriott Key Largo Bay Beach Resort, the Holiday Inn SunSpree Resort, and the Ramada Key Largo Resort & Marina. Further down the road, he owns a string of restaurants and other properties all the way to Key West. "He inspires tremendous loyalty," says Males. "Many people have worked for him for years." One reason: Boulis claims he was the first to offer health insurance for his workers in the Keys.

Not everyone shares Males' enthusiasm. In Canada, Boulis married a 16-year-old girl – he claims now partly to avoid deportation. Also Greek, she later returned to her homeland, where she raised their two sons. In the meantime, Boulis became a millionaire, dutifully mailing money home. Now, from across the Aegean Sea, his Greek wife is suing Boulis for divorce.

The divorce file shows a wide range of financial weigh-ins for the embattled Mr. Boulis: from a high net worth of $90 million in a 1997 loan application, to a low of $47 million in March 1998.



Gus dotes at Marina 8 in Hollywood Boulis the star and his poster boy for the need to regulate what some Greek gambler has taken...

Photo: Jennie Zeiner

Case 9:99-cv-09095-KLR   Document 1   Entered on FLSD Docket 12/29/1999   Page 52 of 64



The reported value of his 11-ship SunCruz fleet slipped from $16.6 million to $3.5 million in the same nine-month period. "The value of his businesses varies widely," says Boulis' divorce attorney Glenn Waldman. Possibly that's due to the pressure of an impending divorce, suggests attorney Karen Coolman Amlong, who represents the former sandwich-maker's wife, Efrosini "Frances" Boulis.

"How dare he say, because of his sin of adultery – which he repeatedly denied to me, by the way – that I am not entitled to share in the fortune that he was able to build, as I was taking care of his interests and our family in Greece?" Mrs. Boulis said in a statement. At the same time, Margaret Hren, his former executive assistant and girlfriend of many years, is rearing Boulis' two other sons, aged 3 and 5, conceived without benefit of marriage. Hren has recently returned to family court seeking more child support from Boulis, using the cudgel of a restraining order to get it.

After several skirmishes in court, Boulis believes she is acting "more reasonable," and that he will continue to be involved as a parent in his young boys' lives. "I am a great father," he says. "But maybe I'm not the best husband. Hopefully, there will be something fair for everybody." He stares evenly as he says this, neither singing the blues, nor berating either woman, nor crying in his ouzo. Boulis does not drink or smoke. We eat in at his Dania Beach office. He has a Greek pita from Miami Subs, and a glass of water. Boulis is surrounded by women. Twelve of his executive-level vice presidents are female. "Is that scary?" he asks.

One of his assistants, Blake Miller, has the task this day of finding him the best deal on a new Ford Explorer. She comes back with two offer sheets from two dealers. The payments are $42 apart. The trouble is, the dealer with the highest bid has been with Boulis for years. "Give them the chance to match it," Boulis tells Ms. Miller. She does. And they do. "Loyalty," Boulis says. And then he tells her to make the deal.

In truth, Boulis admits, he is no one's real husband. Business is his life, his wife, his place to lose the stress his personality demands, and quite possibly creates. To make or lose millions, and to battle his adopted country, his state, his city, at least two counties, the US Army Corps of Engineers, his wife and ex-girlfriend – all at the same time – takes guts. And he has them, in spades. But will they save him? Even with the double-barrels of two women seeking support, and the age of 50 coming up fast in the head-



A decade ago: The original Miami Subs team, Kentucky Gov. John Brown, Chris Boulis, Gus Boulis and Don Perlyn. Seated is Margaret Hren, his administrative assistant- turned-girlfriend, who is now suing him.

lights, Boulis looks like he could still play rough. He is certainly ready.

★   ★   ★

Boulis runs more than 35 companies under the banner of KB Holdings. They include, besides the SunCruz ships, resorts in the Keys, hotels in Miami, motels in Hollywood, and dozens of restaurants throughout South Florida. Although he made his fortune in fast-food, turning Miami Subs into a national name less than a decade after incorporating the first one in 1990, his major plays now appear to be more upscale dining, along with real estate and gaming.

Last November, Boulis agreed to sell Miami Subs to shareholders of Nathan's, the New York hot dog chain, for $14 million. His eight million shares fetched $4.2 million, or 53 cents a share. He may need all that cash, and more. At about the same time, Boulis bought the 63-room Brazil Hotel on Miami Beach for $2.5 million. He plans to renovate and convert it to time-share units.

Last August, Boulis' offices were raided by federal officials who accused him of violating an old shipping law that prevents foreign nationals from owning US flagships. Federal agents seized computers and records. He replaced the computers the same day. If the allegations hold up – and ex-girlfriend Hren may be key, since some of the boats were reportedly titled in her name – Boulis, who became a naturalized citizen in 1997, faces fines of as much as $8.7 million. The civil case is pending in US District Court in Miami. Lawyers are standing by.

In early December, he survived a combined raid by agents of

Photo: Jennie Zeiner

Boulis as politician: The Greek immigrant-turned-tycoon works his ships like he's running for public office. Pictured with customer Greg Haun, Boulis is more popular aboard his ships than he is in Tallahassee or Hollywood, where elected officials would like nothing more than to see him put out of business.



Attorney General Bob Butterworth working in concert with Broward Sheriff's Office deputies. The SWAT team arrived, accompanied by television news crews, smashed their way onto his precious SunCruz VI, and carted off slot machines and nearly $1 million in cash, claiming that Boulis' ships were operating within the three-mile limit (gambling must occur beyond that barrier to avoid state law.)

The next day, Boulis, whose fleet represents more than a third of all the gambling ships in Florida, brought another ship down from Riviera Beach. Then he dispatched an armada of lawyers, including Fred Haddad – the attorney who achieved notoriety by dumping Bobby Brown after the rapper husband of Whitney Houston showed up in a white Rolls-Royce to do his time for DUI.

Haddad turned the state's case against Boulis on its ear. The lawyer produced witnesses who testified that Boulis' ships opened their gambling operations outside the three-mile limit of state jurisdiction, based on the Global Positioning Satellite, not the $250 hand-held to the state's investigators used, or eyeball reckoning.

"They felt like Mark McGwire in a T-ball league," says Ace Blackburn, Jr. of his fellow lawyers Haddad and Bruce Zimet, who argued Boulis' case. The judge found "no probable cause," and ordered the state to return everything. Boulis and his growing legion of supporters cheered, and he became front page news. "They come in my house, they rape me and my customers," Boulis says. "They make me look so bad. What do they want me to do? In one month all my loans are going to be in default, and all my workers are going to be without Christmas jobs. What do they want me to do, laugh at them?"

Two weeks later, the SunCruz VI was back under sail, the charges in the raid all but vanished like the foam the vessel churned out. Only one charge stuck, and that was not to any of Boulis' ships. Owners of the Monte Carlo, a day-cruise ship based in Pompano Beach, anted up $356,000 to settle claims that included cheating by blackjack dealers. "Why are you telling us at Sun-Cruz Casino, in Martha's parking lot, about a different boat?" Boulis says he told Butterworth's boys. "You're here raping me. And you're supposed to be protecting me.

"People want to do this," Boulis says of his gambling boats. "Why should they go to the Bahamas or Las Vegas or Mississippi, out of state? Why shouldn't they be here, and create business here, in Florida?" Pointing out that half of his casino boat clientele is repeat business, and the other half tourists, Boulis adds: "If they didn't love it, I wouldn't build it."

\*    \*    \*

The City of Hollywood is trying to measure its love for Gus Boulis, and determine whether to allow him to build again. On the one hand, he's the man who bought the Martha's Restaurant property 14 years ago for $4 million and turned it into the commercial jewel of north Hollywood Beach, grossing $6 million the first year. Later, he salvaged two other vacant beach properties near Hollywood Boulevard, and built two more restaurants, Giorgio's and Opa. Both appear to be thriving.

On the other hand, he is the man who docked "The Swath" behind Martha's, and incurred the wrath of everyone from the Army Corps of Engineers, who claim it is too big, to the City of Hollywood, which sued to establish a jurisdictional base to have the boat moved.

But it is a six-acre piece of public property in east Hollywood, right by the old band shell on Johnson Street, that is the latest test of what this city – known for its French-Canadian snowbirds and wide boulevards – truly loves. Boulis and his partners, including R. Donahue Peebles, who owns a 30 percent share, plan to build a rival to Beach Place in Fort Lauderdale, or Cocowalk in Miami's Coconut Grove. The name glitters, and rises in value every time Boulis describes it: Diamond on the Beach, a commercial beehive of chic and glitz anchored by a grand, four-star, 366-suite hotel where currently only cars park and miniature golfers play. "Gus, are you in or out of this?" asks Ron Vaill, who runs the golf and bike rental concession on the beach. Not even Boulis knows for sure.

As he walked the property with this reporter, Boulis' project rose in value to $75 million. Peebles, pegged it at about $65 million. Depending on what happens before the Hollywood City Commission, it may not be worth a plugged nickel.

While Attorney General Bob Butterworth was planning his abortive raid of the SunCruz VI, two newly-elected members of the Hollywood City Commission, who had campaigned against Boulis and Peebles' project, looked for ways to sink the Diamond. One of them, John Coleman, called Hollywood a "Geezerville" that didn't want the fast-lane lifestyle Boulis would bring. Another observer of the slow-but-steady pace of life in Hollywood East, jazz enthusiast Kitty Ryan, likened it to Mayberry, where local cops drop into her O'Hara's Saloon for a chat.

Peyton Place may be more like it. After having cut the original deal with the old, business-friendly commission, Boulis hired former City Attorney Alan Koslow to lobby for the Diamond project with the new commission elected last year. (Koslow had resigned after admitting a sexual liaison with a City of Hollywood employee whom he advised the city to pay $50,000 in an unrelated sexual harassment suit.) Then Boulis courted the favor of Mayor Mara Guilianti with a fat campaign contribution. Then the deadline came and went for the financing commitment. Boulis was to commit $17 million. The other $50 million or so required outside lenders, whom Peebles says were not happy with the on-again, off-again commission.

Last month, after a marathon session, the new commission decided to take a straw vote of the community's wishes for the public property. Many see it as a referendum on Boulis himself. "People are very angry with Boulis over this," says Commissioner Sal Oliveri, one of two commissioners who has voted against the project. "They see him as arrogant." They voted to continue the lease with a narrow 3-2 vote.

Boulis says he would gladly step aside and sell his interest to Peebles, if it would get the project done. But that does not seem likely, Peebles says, since it would require a 4-1 vote of the commission to approve the sale. "They've got him tied up," says Peebles, who is developing two other major South Florida hotel projects – one in Miami Beach (the Royal Palm Crown Resort at 15th Street and Collins Avenue), the other in Fort Lauderdale (near the Broward Convention Center). Neither is as mired in politics as the

# High Seas Stakes

**The off-shore gambling business that Boulis helped to pioneer is growing fast, and digging into the pockets of competing pari-mutuels.**

While business buccaneers like SunCruz Casinos owner Gus Boulis amass bountiful war chests through gambling-driven "cruises to nowhere," the boats are starting to become a royalty pain for Florida's other gaming industries. A new report on pari-mutuel activity statewide appears to buoy complaints that the unregulated ships are steering too much revenue off-shore.

Attendance and tax revenues were down across-the-board at greyhound dog tracks, horse race tracks and jai alai frontons during the 12-month period that ended June 1998, the latest figures available from the state Division of Pari-mutuel Wagering show. The worst hit in attendance: thoroughbred race tracks. While they had the highest overall visitor count (8.5 million), they sustained the worst attendance drop from 1997 (10 percent). Dog tracks and jai alai frontons shared equal billing as the big revenue losers. Their tax payments to the state plummeted 12 percent, down almost $6 million at greyhound tracks and almost $1 million at Florida's six frontons. Horse tracks ponied up $5 million less.

Meanwhile, Florida's 26 gambling cruise ships have enjoyed increased attendance and profits in the last two years. On average, these floating casinos attract a combined 8,000 players a day. They generated between $150 million and $170 million in revenues in



The Casino Princesa: touted as an example of cruise ship gambling at its best — largely because of their willingness to share revenues.

1997, according to estimates by the Florida Day Cruise Association. They do pay fuel, sales and excise taxes, but unlike pari-mutuels, day cruise operators aren't regulated by state gaming laws. And they don't contribute gaming tax revenues to state coffers.

Recently, the industry has come under the scrutiny of Florida Attorney General Bob Butterworth, who alleged that six gambling boats – including three owned by Boulis – violated Florida's gaming laws by opening their casinos before entering international waters. While those charges were successfully challenged by Boulis, he remains Butterworth's poster boy for regulatory reform.

Not that everyone wants to eliminate the boats from South Florida's marinas. When the $15 million, 600-passenger Casino Princesa launched last October, top executive Michael Hlavsa had already lined up support from City of Miami officials by creating new jobs and guaranteeing $2.5 million in lease payments over five years for city-owned dock space at Bayside Marketplace.

Pari-mutuels, meanwhile, desperately want to add the lucrative Vegas-style slot machines and card tables so plentiful on day cruises. They have support in the business-friendly, Republican-controlled Legislature, but not in the governor's mansion. Jeb Bush says he won't support the expansion of legalized gambling in Florida. Voters have nixed legalized land casino gambling three times.

Now the "cruise-to-nowhere" cottage industry may feel the squeeze. As state lawmakers step up their investigations, a Virginia congressman wants to revise an obscure federal law that, if passed, could sink the industry nationwide. Operators face a "severe disadvantage" due to lack of national lobbying power, Hlavsa says, but he gives the industry better-than-even survival odds. – *Dana Ballestero* **MB**



Hit me: Casino gambling is a big business, even though gambling referendums have been defeated three times. Today, 26 gambling ships operate across the state and generate up to $170 million in combined annual revenues.

---

Diamond on the Beach.

"I don't want to be on the front page," Boulis says. "I want to build it. I like to do the work. I don't like to talk about it. That's why those people picked me. It doesn't have to be Boulis'. It was always going to be Hollywood's. That's what I love to do. Get the loans from the banks, and bring them into Hollywood."

For years, Boulis has had excellent credit. His loans total in the neighborhood of $300 million. But the raids, and other negative publicity, may have made him less bankable, says the adversarial commissioner Oliveri.

At least one banker disagrees. "He pays his bills. He's very hard-working. He's tenacious. And those are pretty good commodities these days," says BankAtlantic Vice Chairman Jack

Abdo, whose bank has lent to Boulis for more than five years. "We look to past experience to evaluate future performance, and that experience has been good." Still, Abdo concedes that having state and federal agents seize property does nothing to calm the fears of lenders. "None of that stuff is good," he says.

But this is: Boulis staring down life with the confidence of a $1.25-an-hour dishwasher who wants to run the world. "I'll be 50 very soon, and I love every minute of it," he says. "And I won't stop creating jobs, and giving competition to other businesses who aren't willing to put their sweat and know-how to the customer. And they may not like it, and they may call the government … But that won't stop me. I'll continue to do the best for my customers, for my workers, and to pay the government the most at the end." **MB**

# Proposed Airport for
# The City of Stuart
# ✈ Florida

## Statement of Qualifications
## to Provide
## Investment Banking Services

13 October 1994

Prudential Securities Incorporated 



August 24, 1999

Mr. George May
P.O. Box 32247
Palm Beach, FL  33420

Dear Mr. May:

Your recent letter addressed to Mr. Kerkorian regarding a potential opportunity for MGM Grand, Inc.'s involvement in your projects in Florida was referred to my attention.  I apologize for the delay in responding, but I have been out of the country for a few weeks.

We have considered your proposal and have agreed that, unfortunately, this opportunity does not meet our present expansion criteria.

Thank you for your interest in MGM Grand, Inc.

Sincerely yours,

Ken A. Rosevear
President

KR:vw

Enclosure

8-31-99

To; Velda Williams
    MGM GRAND DEVELOPMENT, INC.
    FAX 702-891-3369


FROM: George May


Thank you for contacting me.

I have inside information on Casino's being approved
in Florida.

I would like to meet with you, when I am in Las Vegas.

I will be in Las Vegas from September 21, to the 25th
please set an appointment for us to meet.

Thank you for your help.


                              Thank You


                              George May
                              P.O. Box 32247
                              Palm Bch. gardens
                              Fl. 33420
                              561-333-7334

9-7-99

To: Velda Williams
    MGM GRAND DEVELOPMENT, INC.
    FAX 702-891-3369


RE: JOINT VENTURE


Dear Velda,


I have not received an appointment from you for a meeting
in Las Vegas to discuss the Joint Venture Agreement.

I do have interest in my projects from other gaming com-
panies.

My projects meet your present expansion criteria, and would
greatly profit MGM Grand Development, Inc., and its stock-
holders.

Please contact me with an appointment.

Thank you for your help.




George May
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
561-333-7334



October 5, 1999

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL  33420

Dear Mr. May:

As we previously advised you by mail and by phone, MGM Grand, Inc. does not have an interest in expanding to Florida.

The materials you have submitted are returned herewith.  Thank you for your interest in MGM Grand, Inc.

Sincerely yours,

Ken A. Rosevear
President

KAR:vw

Encls.

10-8-99

To: Ken A. Rosevear President
    MGM GRAND DEVELOPMENT
    FAX 702-891-1114

Re; Joint Venture

The additional information that I sent to you clearly
establishes that a Legislative act is not necessary for
Casino Gambling to exist in Florida because of the Treaty
of 1819, ratified March 3, 1821, the antedated Treaty of
1848, and the Land Patent act of 1850, a conclusive judge-
ment, and the 14th Amendment of the United States of Am-
erica Constitution, under which the non-recognized unknown
Indian Tribe who call themselves the Seminole, run their
Gambling Casino's in Florida without compacts.

Most recently the Florida Supreme Court has clarified this
fact by ruling that the State cannot sue the American Citizen
Isish, American Seminole Chief Billie, and the Supreme Court
of the United States has ruled that under the First, and Four-
teenth Amendment Casino Gambling can be advertised in every
State as MGM GRAND is now doing. Advertise means business trans-
action.

The question is who is going to get the money, and will the
MGM GRAND make money if they do not immediately expand into
new markets. especially markets that will soon be taken over
by the American Citizen Indians, under the original Spanish
Treaty's that Las Vegas has operated under for the past 200
years.

I was born in Florida, and have extensive knowledge of Florida
land, and my projects that the vistors would come to that are
before the American Citizen Indians Gambling Casino's on the
Highway's to the major cities would meet your present expansion
criteria.

I am in need of a joint venture partner to move forward before
the American Citizen Indians take over the market. Please contact
me for a meeting.

                                    Thank You

                                    George May
                                    561-333-7334



HARRAH'S ENTERTAINMENT, INC.
The Premier Name in Casino Entertainment

*FAX*
*901-762-8637*

October 11, 1999

George May
P.O. Box 32247
Palm Beach Gardens, Florida  33420

      Re:   Joint Venture

Dear Mr. May:

      I am in receipt of a duplicate package in which I received and returned approximately three weeks ago regarding the opportunity for a joint venture in your themed hotel, store, restaurant, amusement and entertainment. Again, as I do appreciate the offer extended to Harrah's Entertainment, we have no interest at this time to participate.

Sincerely,

Peter J. Weien
Vice President,
Corporate Development

PJW/slc



HARRAH'S ENTERTAINMENT, INC.
The Premier Name in Casino Entertainment

September 27, 1999

George May
P.O. Box 32247
Palm Beach Gardens, Florida  33420

Re:   Joint Venture

Dear Mr. May:

I am in receipt of your letter regarding the opportunity for a joint venture in your themed hotel, store, restaurant, amusement and entertainment center. As I do appreciate the offer extended to Harrah's Entertainment, we have no interest at this time to participate.

Sincerely,

Peter J. Weien
Vice President,
Corporate Development

PJW/slc

■ **IN-HOUSE COUNSEL** *Bernard R. Diamond, The Trump Organization*

# Practicing 'the art of the deal' every day

**TITLE:** Executive vice president and general counsel

**AGE:** 55

**THE COMPANY:** The Trump Organization is the second largest privately held company in the New York area, with $7.5 billion in revenues in 1999 and 22,000 employees. Although known for huge commercial and residential real estate projects, the company also has other businesses — including a nascent model management company, Trump Hotels and Casino Resorts, the only public Trump company, is a separate entity.

**CHIEF DEPUTY:** Jason Greenblatt, assistant general counsel. No other lawyers work for The Trump Organization.

**PRIMARY OUTSIDE COUNSEL:** Kramer Levin Naftalis & Frankel L.L.P. (New York; condominium plans, financing); Rosenman & Colin L.L.P. (New York; land use issues, real estate litigation); Fischbein Badillo Wagner

Harding (New York; general real estate matters, financing), Proskauer Rose L.L.P. (New York; intellectual property), Belkin, Burden, Wenig & Goldman (New York; landlord-tenant issues and litigation), Jay Goldberg (New York; litigation), Gunster, Yoakley, Valdes-Fauli & Stewart P.A. (West Palm Beach, Fla.; club membership policies).

**IN THE NEWS:** Two years ago, The Trump Organization bought a building next to the United Nations, demolished it and announced plans for a luxury condominium skyscraper, Trump World Tower. Mr. Diamond negotiated the acquisition agreement, supervised due diligence and oversaw the acquisition from

[SEE 'DIAMOND' PAGE B3]

LISA BERG

◗ Corporate Counsel Moves, **B2**; Deal of the Week, **B2**; New Business, **B2**

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**99 9095**

## I (a) PLAINTIFFS

George May

## DEFENDANTS

**CIV-RYSKAMP**

Donald TRump, and The Trump Organization, Inc.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  **Palm Bch.**
(EXCEPT IN U.S. PLAINTIFF CASES)

**MAGISTRATE JUDGE**
**VITUNAC**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Palm Bch.
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
George May     561-963-5135
P.O. BOX 32247, P.B.G. Fl. 33420

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN X ONE BOX ONLY)

- ☐ 1. U.S. Government Plaintiff
- ☐ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. , RESTATEMENT OF TORTS, Interference with prospective business advantage, business, business contract

**IVa.** __7__ days estimated (for both sides) to try entire case

## V. NATURE OF SUIT
(PLACE AN X IN ONE BOX ONLY)

**A CONTACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) B
- ☐ 153 Recovery of Overpayment of Veteran's Benefits B
- ☐ 160 Stockholder's Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**A REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure B
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**A TORTS**
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**A CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**A TORTS**
- ☐ 362 Personal Injury-Med Malpractice
- ☐ 365 Personal Injury-Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability
**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending B
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**B PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General *
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other *
- ☐ 550 Civil Rights * A or B

**B FORFEITURE PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**A LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor Management Relations B
- ☐ 730 Labor Management Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Ret. Inc. Security Act B

**A BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**A PROPERTY RIGHTS**
- ☒ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**B SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**A FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**A OTHER STATUS**
- ☐ 400 States Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12USC3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions * A or B

## VI. ORIGIN
(PLACE AN X IN ONE BOX ONLY)

- ☒ 1. Original Proceeding
- ☐ 2. Removed From State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Refiled
- ☐ 5. Transferred from another district (Specify)
- ☐ 6. Multidistrict Litigation
- ☐ 7. Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**
$75,000.00+

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY
(See Instructions):  NONE
JUDGE _____   DOCKET NUMBER _____

DATE  12-27-99

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
S/F I-2
REV. 9/94

FOR OFFICE USE ONLY: Receipt No. 711682

Date Paid: 12/27/99

Amount: $150.00

M/ifp: _____